ESTATE OF GEORGE B. COOK, DECEASED, G. BRADFORD COOK, EXECUTOR, AND ESTATE OF MARGARET COOK, DECEASED, G. BRADFORD COOK, PERSONAL REPRESENTATIVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Cook v. Commissioner
Docket No. 9533-87
United States Tax Court
T.C. Memo 1993-581; 1993 Tax Ct. Memo LEXIS 597; 66 T.C.M. (CCH) 1523; December 9, 1993, Filed *597 Decision will be entered under Rule 155. For petitioners: Burton W. Kanter and Harold J. Lipsitz. For respondent: James M. Cascino and William G. Merkle. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax for the taxable years 1976 through 1982: Addition to Tax
Year
Deficiency
Sec. 6661
1976
$  24,872.00
--  1977
31,202.00
--  1978
8,857.00
--  1979
207,975.50
--  1980
154,870.00
--  1981
143,473.00
--  1982
137,528.00
$ 34,382
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. Respondent also determined that the entire underpayment for each of the years in issue is a substantial underpayment attributable to tax-motivated transactions and is subject to the increased rate of interest prescribed by section 6621(c). After concessions, the issues for decision are: (1) Whether petitioners are entitled to deduct on their 1979, 1980, and 1981 returns a share of the research or experimental expenditures allegedly incurred by three subchapter S corporations; (2) *598 whether petitioners are entitled to deduct on their 1979, 1980, 1981, and 1982 returns a share of certain miscellaneous business expenses allegedly incurred by the same three subchapter S corporations; (3) whether petitioners' adjusted basis in the stock of Delphi International Oil Corp. was $ 16,125, the amount reported, or $ 10,500, the amount determined by respondent; and, (4) whether petitioners are liable for the increased rate of interest prescribed by section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Mr. George B. Cook deceased, and his wife, Mrs. Margaret Cook, deceased, resided in Lincoln, Nebraska, at the time they filed the petition herein. In this opinion, we refer to Mr. George B. Cook as decedent. We refer to the estates of decedent and his wife as petitioners. Decedent started working for Bankers Life Insurance Co. of Nebraska in 1931 after his graduation from college. He became its chief financial officer in 1946 and served in that capacity until his retirement in 1975. He was also president and chairman of the board of directors *599 of the company at the time of his retirement. During his employment by Banker's Life, he was responsible for the investment decisions of the company. After his retirement, decedent became a private investor and business consultant. In 1978 or 1979, decedent was introduced to Dr. Alvin J. Glasky, who was the founder, president, and a director of Newport Pharmaceuticals International, Inc. (Newport). During most of the period from 1971 through 1986, Dr. Glasky was also chairman of Newport's board of directors. He held a bachelor's degree in pharmacy and a Ph.D. in biochemistry from the University of Illinois. Newport was a corporation organized under the laws of the State of California. Its executive offices were located in Newport Beach, California. Its common stock was traded over the counter on the NASDAQ exchange under the symbol NWPH. During the period in issue, Newport was engaged in the manufacture, marketing, and research and development of two separate series of pharmaceutical compounds. The first series of compounds, inosiplex, was marketed in approximately 52 foreign countries under the trade name "Isoprinosine". In December of 1974, Newport filed an application *600 with the Food and Drug Administration seeking approval of the use of Isoprinosine in the treatment of herpes simplex. This application was rejected in 1975. Newport continued clinical studies, and filed another application with the FDA in 1980, seeking approval of Isoprinosine for the treatment of a type of encephalitis. This application was rejected on July 31, 1981. The other series of compounds manufactured by Newport, the "NPT-15000 Series", was at an experimental stage during the period in issue. It had been discovered by the Sloan-Kettering Memorial Institute for Cancer Research ("Sloan-Kettering"), which held the original patent on the compounds. By an agreement dated March 28, 1978, Sloan-Kettering had transferred to Newport an undivided one-half interest in the "Patent Rights [of the NPT-15000 Series], and the inventions and improvements covered thereby, throughout the world." The term "Patent Rights" is defined in the agreement as follows: a. Any U.S. patent application hereafter filed covering any invention or improvement resulting from the Collaborative Effort, any division, continuation, and continuation-in-part of any such application, and any patent which *601 shall issue based on such application, division, continuation, and continuation-in-part; b. Any patent which is a reissue or an extension of, or a patent of addition to, any patent defined in (a) above; and c. Any patent application or patent corresponding to any patent application or patent identified in (a) or (b) above which is hereafter filed or issued in any country.
Newport was given the exclusive right to exploit the patent rights on a worldwide basis, and agreed to use its best efforts to exploit the patent rights for the mutual benefit of both parties. The agreement further provides: If the Patent Rights, or any portion thereof, are exploited by licensing third parties, SKI [Sloan-Kettering] and Newport shall jointly license any such third party upon mutually agreeable terms and conditions in compliance with [Sloan-Kettering's patent agreement with the United States Department of Health, Education and Welfare]. * * * All such license agreements must be jointly signed by SKI and Newport.
In preclinical and clinical tests, joint research on a member of the NPT- 15000 Series of compounds, NPT-15392, had demonstrated an effect on the human immune system. *602 However, during the period in issue, Newport did not file an application concerning the NPT-15000 Series with the FDA. Newport lacked the funds necessary to develop the experimental compound for commercial purposes. In 1978 or 1979, decedent bought 10,000 shares of Newport common stock for $ 10 per share, together with warrants for the purchase of an additional 20,000 shares of Newport common stock at the exercise price of $ 15 per share. At that time, decedent considered investing as much as a half million dollars in Newport. During 1979, decedent became a member of Newport's board of directors. He was a member of Newport's board through April 30, 1983. Decedent learned from Dr. Glasky of Newport's need for research and development funds to develop NPT-15392. Decedent discussed the possibility of investing in Newport with various friends and business associates, including Mr. Burton W. Kanter, Mr. William M. LaMont, Jr., and Mr. Clint W. Murchison III. At that time, Mr. Kanter was engaged in the practice of Federal income tax law as a partner in the law firm of Kanter and Eisenberg and was involved in structuring various types of investments, including "tax shelter" type *603 investments. He had no formal education in the fields of pharmaceutical compounds or medicine. Mr. LaMont and Mr. Murchison, who were related to each other by marriage, were personal friends and business associates of decedent. Neither individual had any educational or professional background in the fields of pharmaceutical compounds or medicine. Decedent, Mr. Kanter, Mr. LaMont, and Mr. Murchison met with Dr. Glasky and others during the summer of 1979 at Newport's offices in Newport Beach, California. During that meeting, they agreed to incorporate a new corporation, Immunological Research Corp. (IRC), and to execute several agreements, described below. Thereafter, during 1980, Mr. Lamont became a director of Newport, and he remained a director until 1984. Immunological Research Corp.
IRC was incorporated under the laws of the State of Delaware on July 19, 1979. It was authorized to issue the following shares of stock: Class
Number
Par Value
A Preferred
8,000
$ 1.00
B Preferred
1,000
0.10
Common
1,000
0.10
On July 20, 1979, IRC entered into a stock subscription agreement with various individuals and trusts under which it agreed to issue a total *604 of 999 shares of common stock as follows: Name of Shareholder
Shares
Percent
Contribution
Solomon A. Weisgal, as
105.450
0.10556
$ 105,454.44
trustee of the Tablet Trust
Solomon A. Weisgal, as
105.450
0.10556
105,454.44
trustee of the Capsule Trust
Solomon A. Weisgal, as
105.450
0.10555
105,444.45
trustee of the Liquid Trust
Carl I. Kanter
16.650
0.01666
16,643.34
Burton W. Kanter, as
166.500
0.16666
166,493.34
trustee of the NP
Discovery Trust
Burton W. Kanter, as
166.500
0.16666
166,493.34
trustee of the NP
Breakthrough Trust
Lucille G. Murchison
41.625
0.04167
41,628.33
Clint W. Murchison III
41.625
0.04167
41,628.33
Robert Frank Murchison
41.625
0.04167
41,628.33
Virginia Lucille Murchison
41.625
0.04167
41,628.33
Barbara Jeanne Murchison
41.625
0.04167
41,628.33
Coke Anne Saunders
41.625
0.04167
41,628.33
Mary Noel LaMont
41.625
0.04167
41,628.33
Burk Coleman Murchison
41.625
0.04166
41,618.34
Total
999.000
1.00000
999,000.00
Decedent's stock was acquired through two grantor trusts, NP Discovery Trust and NP Breakthrough Trust, which he formed for that purpose. The other shareholders are affiliated with either *605 Mr. Kanter or the Murchison family. Each of the three groups of shareholders agreed to purchase 333 shares for total consideration of $ 333,000. On July 20, 1979, Mr. Kanter became IRC's president and a member of its board of directors. He served in those positions until December 17, 1982, when IRC became a wholly owned subsidiary of Newport, as described below. On July 20, 1979, Ms. Patricia A. Grogan was also elected vice president and a member of IRC's board of directors. She served in those positions until November 6, 1981. Mr. Kanter and Ms. Grogan were the only members of IRC's board of directors from July 20, 1979, through December 17, 1982. On July 20, 1979, Ms. Sharon Meyers was elected secretary and treasurer of IRC. After Ms. Grogan resigned as vice president, Ms. Meyers also became vice president of IRC. She served in those positions until December 17, 1982. During the years 1979 through 1982, Ms. Grogan and Ms. Meyers were employed by the law firm of Kanter and Eisenberg as an accountant and an administrative assistant, respectively. They also served as officers and directors of various other corporations organized by the law firm of Kanter and Eisenberg, including *606 Antiviral Research Corp., described later in this opinion. Neither of them had any background or experience in the research and development of pharmaceutical compounds. They served as directors and officers of IRC for the convenience of IRC and its shareholders. They performed only ministerial tasks such as bookkeeping, accounting, and executing certain documents. In their capacities as directors and officers, they were empowered to execute certain documents and did so under the direction of Mr. Kanter. They made no independent decisions, and acted only on instructions from Mr. Kanter. They received no compensation from IRC or Antiviral Research Corp.
On or about August 8, 1979, a checking account was opened in IRC's name at the American National Bank and Trust Co. of Chicago. Shareholders of IRC contributed a total of $ 999,000 to IRC pursuant to the stock subscription agreement. Of that amount, $ 18,000 was deposited into IRC's checking account during August of 1979, $ 980,000 was deposited into Mr. Kanter's special account at the American National Bank and Trust Co. of Chicago and was later transferred to Newport during September 1979, and $ 1,000 was paid directly to *607 a third party during September 1979. IRC's stock subscription agreement, mentioned above, includes the following provisions: 4. Patricia A. Grogan is authorized to act on behalf of the corporation to execute and deliver any and all documents required in connection with any transaction between Newport Pharmaceuticals International, Inc. (hereinafter referred to as "Newport") and the Corporation, including but not limited to, the execution and delivery of a Research, Development and License Agreement between Newport and the Corporation. 5. Patricia A. Grogan is hereby granted an irrevocable power of attorney to act on the undersigned's behalf to execute and deliver a Put and Call Agreement with Newport and to execute and deliver such other documents and to take such other actions as may be required in connection therewith.
On August 24, 1979, as contemplated under the stock subscription agreement, IRC entered into a "Research, Development and License Agreement" (herein referred to as IRC Research Agreement) with Newport. Under that agreement, IRC agreed to pay Newport the aggregate sum of $ 980,000. In return, Newport agreed to provide IRC with "research and other technical *608 personnel and equipment, supplies and facilities as may be necessary to conduct the research and development project specified in Exhibit A hereto". Exhibit A to the agreement describes the subject of the research as follows: The research which is the subject of this Agreement will include, but is not limited to the areas of: chemical synthesis and analysis of compounds to be agreed upon; research and development of pharmaceutical dosage forms and methods for quality control testing for identity, purity and stability; preclinical toxicological, pharmacological and biochemical studies in tissue culture and animal models to determine safety efficacy and method of action and to provide guidelines for the investigation of potential applicability to human subjects; toxicological, pharmacological and biochemical studies in human subjects to determine safety and degree of tolerance in man; and clinical trials to determine range of clinical potential and conditions for obtaining maximum therapeutic benefit at minimum risk in clinical usage. This shall be a fixed price contract and Newport will provide to the Corporation [i.e., IRC] data on NPT-15392 and such other substances as may *609 be agreed to, establishing the acute toxicity (single dose administration to two species); subacute toxicity (multiple does [sic] administration in two species for 90 days); single dose administration to humans designed to establish the level at which the drug may be safely administered (including laboratory and physical measurements of potential side effects) and the results of efficacy testing in at least 12 patients in which laboratory parameters of the immune response are measured.
The IRC Research Agreement also states, in pertinent part, as follows: 2. Ownership of Project Results. Any and all products, processes, compounds, inventions, ideas, patents, patent rights, technical information, data and other proprietary know-how resulting or deriving from the Project, including all improvements thereto, and any other rights to commercially exploit the Project and the products and results thereof, including but not limited to, licensing and distribution rights, shall be the sole and exclusive property of the Corporation [i.e., IRC]; provided, however, the Corporation shall have no ownership rights or rights which may be deemed to be a sub-license to the extent that *610 any of the foregoing constitutes a "Patent Right" or an invention or improvement covered thereby as defined in the agreement dated March 28, 1978 between Newport and Sloan-Kettering Institute or is covered by the Assignment Agreement between Newport and Paul Gordon dated April 26, 1971 (collectively the "Prior Agreements"). 3. Reports. Newport agrees that it will provide to the Corporation not less than once every month following the commencement of activities hereunder, and upon the reasonable request of the Corporation, such technical reports provided for herein in such detail as the Corporation may request.
The IRC Research Agreement gives Newport "an exclusive license" to use the results of the research and to manufacture, distribute, and sell any products resulting from the research. The agreement provides as follows: 4.1 Grant of Exclusive License to Newport. The Corporation [i.e., IRC] hereby grants to Newport and Newport hereby accepts from the Corporation an exclusive license (the "License"), with the right to sublicense, to use the results of the Project owned by the Corporation (the "Know-how") and to manufacture, distribute and sell any and all *611 products and compounds and any and all improvements relating thereto owned by the Corporation (the "Products") resulting or deriving from the Project or testing conducted in connection with the Project. 4.2 License Payments. (a) In consideration for the License, Newport shall pay to the Corporation royalties of five percent of the first $ 20,000,000 of net sales (as defined below) in the United States and Canada of the Products and of products otherwise manufactured and sold by Newport (or of which Newport licenses the manufacture or sale) in the manufacture of which, the Know-how is employed (collectively with the Products, the "Royalty Products") and two percent of such net sales in excess of $ 20,000,000; provided, however, Newport agrees to pay the Corporation a minimum royalty of an aggregate of $ 250,000 prior to the third anniversary of the date of this Agreement. There shall be no required minimum royalty after the payment by Newport hereunder of royalties aggregating $ 250,000.
On August 24, 1979, as contemplated under the stock subscription agreement, Ms. Grogan, acting as agent for the shareholders of IRC, entered into a "Put and Call Agreement" with Newport *612 (referred to herein as IRC Put and Call Agreement). That agreement states, in pertinent part, as follows: Recitals
* * * B. The parties desire that the Shareholders have an option to put the Shares to Newport and that Newport have an option to call the Shares from the Shareholders in exchange for certain shares of the common stock, par value $ .10 per share (the "Common Stock"), of Newport all as more fully provided herein, in either instance in a transaction intended to qualify as a "B" reorganization within the meaning of Section 368(a)(1)(B) of the Internal Revenue Code of 1954, as amended. * * * 1. Shareholders' Put Option
Newport grants to the Shareholders the right and option (the "Put Option"), exercisable at any time in accordance with the provisions hereof during the three year period commencing on March 1, 1981 to require Newport to exchange the Shares for a number of shares of Newport Common Stock determined in accordance with the provisions of paragraph 3 hereof. 2. Newport's Call Option
The Shareholders grant to Newport the right and option (the "Call Option"), exercisable at any time in accordance with the provisions hereof during the five *613 year period commencing on January 1, 1981 to require the Shareholders to exchange the Shares for a number of shares of Newport Common Stock determined in accordance with the provisions of paragraph 3 hereof. 3. Newport Shares to be Exchanged
The number of shares of Newport Common Stock to be issued in exchange for the Shares upon exercise of the Put Option or the Call Option shall be that number of shares of Common Stock of Newport which equals $ 1,000,000 divided by the exchange price (the "Exchange Price") as determined in accordance with paragraph 4 (such number of shares, as adjusted from time to time pursuant to paragraph 4 hereof are hereinafter referred to as the "Newport Shares"). Based on an initial Exchange Price of $ 10.00, the initial number of Newport Shares is 100,000 shares. * * * 5. Manner of Exercise
The Put Option and the Call Option each may be exercised only with respect to all of the Shares. The Put Option may be exercised only by means of a written notice of exercise signed by or on behalf of Shareholders holding at least 80% of the Shares or by the Agent and given to Newport in accordance with the provisions of paragraph 14 hereof. The *614 Call Option may be exercised only by means of a written notice of exercise given by Newport to the Shareholders or to the Agent on their behalf in accordance with the provisions of paragraph 14 hereof. The Put and Call Options may be exercised and if exercised shall be honored, irrespective of whether any dispute exists, or other agreement is in force, among the parties hereto or between Newport and the Corporation. 6. Exchange Reorganization Transaction
The parties agree to promptly prepare a plan and agreement of reorganization (the "Reorganization Agreement") among them acceptable in form and substance to them, which Reorganization Agreement shall be initialled by the parties hereto and become Exhibit B hereto. Within 15 days following notice of exercise of the Put Option or the Call Option, the parties shall execute and deliver the Reorganization Agreement, with such changes therein as to which the parties may agree, and such additional agreements and documents, if any, as are deemed necessary or advisable by the parties and their respective counsel to effect the exchange of the Shares for the Newport Shares in a transaction intended to qualify as a "B" reorganization *615 within the meaning of Section 368(a)(1)(B) of the Internal Revenue Code of 1954, as amended. Concurrently with such execution, which shall take place at the principal offices of Newport unless otherwise agreed by the parties, the Agent shall deliver or cause to be delivered to Newport stock certificates evidencing all of the Shares each duly endorsed in favor of Newport by the Shareholder who owns the Shares evidenced by such certificate or accompanied by duly executed stock powers, and Newport shall issue and deliver or cause to be delivered to each Shareholder, or to the Agent on behalf of each Shareholder, a stock certificate representing the number of Newport Shares which such Shareholder is entitled to receive in exchange for his Shares, as determined in accordance with paragraphs 3 and 4 hereof; provided that no fractional shares shall be issued and that any fractional shares shall be aggregated and allocated by Newport in accordance with instructions from the Agent.
On August 24, 1979, Newport entered into a warrant purchase agreement with CKM Investments, an Illinois partnership. Under the agreement, Newport agreed to issue and sell a warrant to purchase 200,000 shares *616 of Newport's common stock in exchange for $ 20,000. The warrant was exercisable in whole or in part at any time for 5 years from the date of issuance. The initial exercise price was $ 15 per share, subject to adjustment provided in the agreement. Decedent was one of two general partners of CKM Investments, and the shareholders of IRC, including the two grantor trusts which held decedent's stock in IRC, were limited partners in CKM Investments. Thus, the shareholders of IRC also obtained rights to acquire Newport common stock through CKM Investments. On August 24, 1979, Newport entered into a consulting agreement with Immunological Marketing Services, Inc., under which the latter corporation agreed to supply the consulting services of decedent for a period of 5 years. As consideration, Newport agreed to pay Immunological Marketing Service, Inc. a fee of one-fourth of 1 percent of net sales, from sales of products in the United States and/or Canada for 15 years. For the taxable years in issue, IRC filed small business corporation income tax returns on Forms 1120-S, which report the following income, deductions, and losses: 1979
1980
1981
1982
Income:
Gross receipts
--
--
--
--
Interest income
--
$ 92 $ 185 --
Total income
--
92 185 --
Deductions:
Research and
$ 980,000 --
--
--
development expenses
Legal fees
3,590 34,000 --
$ 4,775 Amortization
21 50 50 48 Bank charges
7 --
--
--
Accounting fees
--
500 2,250 --
Corporate filing fees
--
90 90 --
Franchise taxes
--
71 37 71 Miscellaneous
--
--
4 10 Office supplies
--
--
--
125 Total deductions
983,618 34,711 2,431 5,029 Taxable income (loss)
(983,618)
(34,619)
(2,246)
(5,029)
*617 Schedules K-1, Shareholder's Share of Undistributed Taxable Income, etc., attached to IRC's returns, report decedent's share of the above losses as follows: 1979
1980
1981
1982
NP Discovery Trust
($ 163,937)
($ 5,770)
($ 375)
($ 838)
NP Breakthrough Trust
(163,937)
(5,770)
(375)
(838)
Total
(327,874)
(11,540)
(750)
(1,676)
In April of 1981, the shareholders of IRC notified Newport in writing of their intention to exercise their put option pursuant to the terms of the IRC Put and Call Agreement. On December 17, 1982, the shareholders of IRC and Newport entered into an Agreement and Plan of Reorganization. Pursuant to this Agreement and Plan of Reorganization, each shareholder of IRC exchanged his or her shares of stock in IRC for shares of stock in Newport, and IRC became a wholly owned subsidiary of Newport. The IRC shareholders received a total of 100,000 shares of Newport stock. NP Discovery and NP Breakthrough Trusts each received 16,666 shares of the Newport stock. The Newport shares received by IRC shareholders were registered with the Securities and Exchange Commission some time after December 17, 1982. Antiviral Research Corp.
On *618 or about July 1, 1980, decedent and 14 other individuals, including Dr. Glasky, Mr. LaMont, and Mr. Murchison, executed a Pre-incorporation Subscription Agreement under which they agreed to purchase 900 shares of the common stock of a new corporation, Antiviral Research Corp. (hereinafter referred to as ARC). Each of the investors agreed to pay cash and to deliver an unconditional, irrevocable letter of credit as follows: Number of
Letter Name Shares Percent
Cash of Credit
Total
George Cook
134
.14889
$  33,500
$ 100,500
$ 134,000
Alvin Glasky
150
.16667
37,500
112,500
150,000
Sanford K. Glasky
50
.05556
12,500
37,500
50,000
William LaMont, Jr.
40
.04444
10,000
30,000
40,000
Clint Murchison III
31
.03444
7,750
23,250
31,000
10 other shareholders
495
.55000
123,750
371,250
495,000
(aggregate)
Total
900
1.00000
225,000
675,000
900,000
The Pre-Incorporation Subscription Agreement includes the following provisions: 5. Patricia A. Grogan, as President of the Corporation, is authorized to act on behalf of the Corporation to execute and deliver any and all documents required in connection with any transaction between *619 Newport Pharmaceuticals International, Inc. (hereinafter referred to as "Newport") and the Corporation, including, but not limited to, the execution and delivery of a Research, Development and License Agreement between Newport and the Corporation. 6. The undersigned acknowledge that the Letters of Credit delivered to the Corporation by the undersigned in payment of their subscription hereunder shall thereafter be assigned by the Corporation to Newport in payment of the Corporation's obligations to Newport under the Research Development and License Agreement described above. The undersigned hereby consent to said assignment. 7. Patricia A. Grogan, as Agent, is hereby granted an irrevocable power of attorney to act on the undersigned's behalf to execute and deliver a Put Agreement with Newport and to execute and deliver such other documents and to take such other actions as may be required in connection therewith.
ARC was incorporated on July 3, 1980, under the laws of the State of Delaware. On the same date, Ms. Grogan and Ms. Meyers, who were officers and directors of IRC, were elected members of ARC's board of directors. Ms. Grogan was also elected president of ARC, and *620 she served in that position until April 2, 1982. On July 3, 1981, Ms. Meyers was elected secretary, and on July 7, 1981, she was also elected vice president and treasurer. After Ms. Grogan's resignation, Ms. Meyers became the president. She served in those positions until April 11, 1983, when ARC became a wholly owned subsidiary of Newport, as described below. On August 14, 1980, as contemplated under the Pre-Incorporation Subscription Agreements, ARC entered into a "Research, Development and License Agreement" (herein referred to as ARC Research Agreement) with Newport. Under this agreement, ARC agreed to pay Newport the aggregate sum of $ 900,000 on or before September 1, 1980, in the following manner: the sum of $ 225,000 in cash and the sum of $ 675,000 by assignment and delivery to Newport of unconditional, irrevocable letters of credit theretofore received by [ARC] for the account of its Shareholders in said aggregate principal amount * * *
In return, Newport agreed to provide ARC with "research and other technical personnel and equipment, supplies and facilities as may be necessary to conduct the research and development project specified in Exhibit A hereto". *621 Exhibit A to the agreement, entitled "Goals and Objectives for Research on NPT 15392", provided in part: The objectives of this proposed study will be: 1) To determine a minimum immunological effective dose of NPT 15392 in normal adult male volunteers. 2) To determine any dose-related side effects of NPT 15392 after single oral doses of 0.1, 0.7 and 3.5 mg. in comparison with placebo. The second objective listed above is the primary one for this study and the immunological aspects (#1) are for information purposes only. This study will be double-blind placebo controlled and should give further support to the observations from the pilot phase 1 study. IPHAR has been chosen as the likely facility for this study.
Exhibit A further specifies certain systems in which NPT-15392 was to be evaluated "in order to explore its preclinical efficacy and to gain some understanding of the possible mechanism of action in order to identify the point of drug action on immune response." The ARC Research Agreement provides for a different formula for license payments from Newport than the formula used in the IRC Research Agreement. The pertinent part of the ARC Research Agreement is *622 as follows: 4.2 License Payments
(a) In consideration for the License, Newport shall pay to the Corporation royalties of 90 percent of 1 percent (.90%) of net sales (as defined below) worldwide of the Products and of products otherwise manufactured and sold by Newport (or of which Newport licenses the manufacture or sale) in the manufacture of which the Know-how is employed (collectively with the Products, the "Royalty Products") not to exceed, however, an aggregate of $ 2,700,000.
The ARC Research Agreement also provides for a 45-day notice period for ARC to terminate the agreement, instead of a 30-day notice as in the case of the IRC Research Agreement. Finally, the ARC Research Agreement requires Newport to obtain product liability insurance with ARC named as coinsured in order to secure its indemnification obligations under the agreement. Except for these differences, the ARC Research Agreement is almost identical to the IRC Research Agreement. On August 14, 1980, as contemplated under the Pre-Incorporation Subscription Agreement, Ms. Grogan, acting as agent for the shareholders of ARC, entered into a "Shareholders' Put and Call Agreement" (herein referred to *623 as ARC Put and Call Agreement) with Newport. This Agreement is dated "the 23rd day of April, 1980" but the parties have stipulated that it was executed on or about August 14, 1980, the same day as the ARC Research Agreement. It was amended on December 30, 1980. Its terms are substantially the same as those of the IRC Put and Call Agreement. It provides in pertinent part, as follows: 1. Put and Call Options
1.1 Newport hereby grants to the Shareholders the right and option (the "Put Option"), exercisable at any time in accordance with the provisions hereof during the five year period commencing on January 1, 1981, to require Newport to exchange the Shares for a number of shares of Newport Common Stock determined in accordance with the provisions of paragraph 2 hereof. 1.2 The Shareholders hereby grant to Newport the right and option (the "Call Option"), exercisable at any time in accordance with the provisions hereof during the five year period commencing on January 1, 1981, to require the Shareholders to exchange the shares for a number of shares of Newport Common Stock determined in accordance with the provisions of Paragraph 3 hereof. 2. Newport Shares to be *624 Exchanged
The number of shares of Newport Common Stock to be issued in exchange for the Shares upon exercise of the Put Option or the Call Option shall be that number of shares of Common Stock of Newport which equals $ 2,700,000 (reduced by the amount of royalties received by the Corporation pursuant to that certain Research, Development and License Agreement dated as of the date hereof executed by and between the Corporation and Newport) divided by the exchange price (the "Exchange Price") as determined in accordance with paragraph 3 * * *. Based on the initial Exchange Price of $ 7.00, the initial number of Newport Shares is 385,714 shares. 3. Antidilution Provisions
* * * 4. Manner of Exercise
The Put Option and Call Option each may be exercised only with respect to all of the Shares. The Put Option may be exercised only by means of a written notice of exercise signed by or on behalf of Shareholders holding at least 80% of the Shares or by the Agent and given to Newport in accordance with the provisions of paragraph 13 hereof. The Call Option may be exercised only by means of a written notice of exercise given by Newport to the Shareholders or to the agent *625 on their behalf in accordance with the provisions of paragraph 13 hereof. The Put Option or Call Option each may be exercised and if exercised shall be honored, irrespective of whether any dispute exists, or other agreement is in force, among the parties hereto or between Newport and the Corporation. 5. Exchange Reorganization Transaction
Within 15 days following notice of exercise of the Put Option or Call Option, the parties shall execute and deliver a plan and agreement of reorganization substantially in the form of Exhibit B hereto (the "Reorganization Agreement"), with such changes therein as to which the parties may agree and such additional agreements and documents, if any, as are deemed necessary or advisable by the parties and their respective counsel to effect the exchange of the Shares for the Newport Shares in a transaction intended to qualify as a "B" reorganization within the meaning of Section 368(a)(1)(B) of the Internal Revenue Code of 1954, as amended. Concurrently with such execution, which shall take place at the principal office of Newport unless otherwise agreed by the parties, the Agent shall deliver or cause to be delivered to Newport stock certificates *626 evidencing all of the Shares each duly endorsed in favor of Newport by the Shareholder who owns the Shares evidenced by such certificate or accompanied by duly executed stock powers, and Newport shall issue and deliver or cause to be delivered to each Shareholder, or to the Agent on behalf of each Shareholder, a stock certificate representing the number of Newport Shares which such Shareholder is entitled to receive in exchange for his Shares, as determined in accordance with paragraphs 2 and 3 hereof; provided that no fractional shares shall be issued and that any fractional shares shall be aggregated and allocated by Newport in accordance with instructions from the Agent.
On August 18, 1980, ARC opened two checking accounts at the American National Bank and Trust Co. of Chicago. During the rest of August and September, petitioner and certain other shareholders of ARC deposited a total of $ 175,000 into one of ARC's checking accounts. During the period August 18, 1980, through December 31, 1980, these funds were invested in interest-bearing commercial paper. The interest earned was not reported on ARC's 1980 tax return, but Forms 1099 were issued directly to the shareholders *627 who had contributed the funds. On or about December 31, 1980, $ 712,500 was transferred by wire from one of ARC's checking accounts to Newport's account at Lloyds Bank of California. On or about the same date, Dr. Glasky issued a personal check to Newport in the amount of $ 112,500, which bore the notation "for Antiviral Research Corp.", and Mr. Sanford Glasky issued a personal check to Newport in the amount of $ 37,500, which bore the notation "for Antiviral Research Corp." Mr. Glasky is Dr. Glasky's brother, and he was an officer and director of Newport. On or about December 31, 1980, ARC assigned to Newport its interest in a letter of credit dated August 19, 1980, which authorized Newport to draw $ 37,500 from an account of ARC shareholder Robert D. Pildes after March 31, 1981, but not later than April 30, 1981. On or about December 30, 1980, Newport issued to the ARC shareholders warrants to purchase 258,000 shares of Newport's common stock in exchange for $ 2,580. The warrants were exercisable in whole or in part at any time from the date of issuance. The initial exercise price was $ 10 per share subject to adjustment for the dilution of Newport's stock. On April 24, 1990, *628 Newport entered into a research agreement and a put option with another corporation, Viral Potentiator. The agreements are unrelated to the issues in this case, but they are similar to Newport's agreements with ARC and formed a part of a "plan" which was the subject of Newport's application to the California Department of Corporations to make a limited offering of its common stock. Newport's application described the plan as follows: Applicant has heretofore entered into Research, Development and License Agreements, dated April 24, 1980 and August 13, 1980, respectively, with Viral Potentiator Antiviral Research Corporation, a Delaware corporation ("Viral") and Antiviral Research Corporation, a Delaware corporation ("Antiviral"), pursuant to which Viral and Antiviral have agreed to fund an aggregate of $ 1,050,000 of expenditures in research and development projects as described therein, in consideration of Applicant's agreement to grant an exclusive license and pay royalties to Viral and Antiviral upon net sales by Applicant and its sublicensees of products resulting from such research and development projects. The Agreements provide for payment of royalties by Applicant to *629 Viral and Antiviral in the aggregate amount of 1.05% of such net sales, subject to a maximum royalty of $ 3,150,000. Applicant has also entered into Shareholders Put Option Agreements, dated April 23, 1980 and August 14, 1980, respectively, with the shareholders of Viral and Antiviral providing for the issuance, subject to the prior qualification thereof, of a Put Option for an aggregate of 450,000 shares of Applicant's Common Stock upon exercise of the Put at any time during the five year period commencing January 1, 1981. Upon exercise of the Put by the shareholders of Viral and Antiviral, and their tender of shares of outstanding capital stock of Viral and Antiviral, Applicant will issue an aggregate of 450,000 shares of its Common Stock (subject to adjustment as set forth in the Shareholders Put Option Agreement) in a transaction intended to qualify as a tax-free reorganization under Section 368(a)(1)(B) of the Internal Revenue Code of 1954, as amended. Accordingly, Applicant requests authority to offer, sell and issue such securities as may be offered, sold and issued pursuant to the foregoing plan under the Corporate Securities Law of 1968 and, without limiting the generality *630 of the foregoing, the authority to offer, sell and issue the Put Option and an aggregate of not to exceed 450,000 shares of its $ 0.10 par value Common Stock (subject to adjustment) pursuant to the exercise of the Put Option to the shareholders of Viral and Antiviral, all in accordance with the terms and conditions of the Shareholders Put Option Agreements attached hereto as Exhibits B-1 and B-2, respectively.
For the taxable years 1980 through 1983, ARC filed small business corporation tax returns on Forms 1120-S, which report the following income, deductions, and losses: 1980 1981 1982 1983 Income:
Gross receipts
-- -- -- -- Interest income
-- $  22 -- -- Total Income
-- 22 -- -- Deductions:
Research and
$ 900,000 -- -- -- development expenses
Bank charges
-- 4 -- -- Professional fees
-- 710 -- -- Taxes
-- -- $  30 $  9 Accounting and
administrative fees
-- -- 325 -- Legal fees
-- -- 18,606 -- Filing fees
-- -- 98 -- Miscellaneous
-- -- 186 45 Total deductions
900,000 714 19,245 54 Taxable income (loss)
(900,000)
(692)
(19,245)
(54)
*631 Schedules K-1, Shareholder's Share of undistributed taxable Income, etc., attached to ARC's returns report decedent's share of the above losses as follows: 1980
1981
1983
1983
George Cook
($ 134,000)
($ 103)
($ 2,866)
($ 8)
By November 3, 1981, all the shareholders of ARC, except Dr. Glasky and Mr. Sanford Glasky, had agreed to exercise the put option under the ARC Put and Call Agreement. On April 11, 1983, the ARC shareholders and Newport entered into an agreement and plan of reorganization pursuant to the terms of the ARC Put and Call Agreement. Under the agreement and plan of reorganization, the ARC shareholders exchanged their ARC stock for a total of 128,571 shares of Newport stock, and ARC became a wholly owned subsidiary of Newport. Thereafter, the Newport shares received under the agreement and plan of reorganization and the warrants to purchase Newport stock held by the ARC shareholders were registered with the Securities and Exchange Commission. Biological Research Corp.
During November of 1981, Dr. Glasky mailed to prospective investors an offering circular for the purchase of units consisting of one share of the stock of a corporation *632 to be organized under California law, Biological Research Corp. (hereinafter referred to as BRC) and two warrants, each exercisable to purchase a share of Newport stock. The units are described in the offering circular as follows: The offering consists of 100,000 Units each consisting of one share of the Common Stock, no par value, of the Company [i.e., BRC], two Warrants to Purchase Common Stock of Newport, each exercisable to purchase one share of Newport Common Stock at a price of $ 10 until December 31, 1986 and an option exercisable for a period of five years commencing January 2, 1983 to exchange all of the shares of the Company purchased for that number of shares of Newport Common Stock determined by dividing the aggregate purchase price of the Units purchased by an Exchange Price of $ 7.00 * * * An option reciprocal to that offered as part of the Units is granted to Newport on terms and conditions similar thereto. The minimum investment is 5,000 Units ($ 50,000).
The offering circular states that BRC will be organized "to contract for the conduct of research with respect to" NPT-15392, and will apply the proceeds of the offering to payments to Newport under a Research, *633 Development and License Agreement dated October 15, 1981, between Newport and BRC. The offering circular also states that BRC "will sell any rights it has or may acquire to the manufacture, marketing, and sale of NPT 15392 or any compound developed as a result of the research * * * to Newport * * * in consideration for the payment of royalties". The offering circular describes the "business" of the new company as follows: The Company [i.e., BRC] was organized solely for the purpose of funding research regarding NPT 15392. Its sole function and activity will consist of contracting with Newport for the provision of such research and other technical services in connection therewith.
The offering circular includes an extensive discussion of the Federal income tax consequences of investing in BRC, including the eligibility of prospective shareholders to deduct research or experimental expenditures under section 174. On that point, the offering circular states as follows: Section 174 permits a taxpayer to deduct currently otherwise qualifying research or experimental expenditures only if they are incurred "in connection with his trade or business." * * * It is anticipated *634 that the "trade or business" of the Company for purposes of Section 174 will be the research and experimentation contracted for by it to develop the Project and the subsequent commercialization of the Project by license to Newport or by such other means as may occur. * * * In addition to challenging the applicability of Section 174 on the grounds described above, it is also possible that the IRS might assert that the form of the Company's transactions should be disregarded on the basis that the Company is only providing financing or research services or both to Newport or that the activities of the Company should be attributed to Newport. * * * Moreover, the IRS may assert that a portion of the fees paid to Newport for qualifying research and experimental efforts pursuant to the Research Agreement are excessive, and to that extent, are not payments for research and development governed by Section 174. * * * Finally, the IRS may assert that despite the express provisions of Section 174, the Company's research or experimental expenditures may not be deducted as paid, under the theory that to allow such deductions to be taken in the year of payment would result in a material distortion *635 of the Company's (or shareholders') income. * * * * * * It is possible that the IRS will challenge the Company's claimed deductions under Section 174 and that its challenge will be upheld by the courts. If the IRS were to prevail in challenging such deductions, the result would be a substantial reduction in the value of any tax benefits of an investment in the Company.
BRC was incorporated under the laws of the State of California on December 2, 1981. Six individuals, including decedent, purchased 47,000 units, as described in the offering circular, for $ 10 per unit. The names of the individuals who purchased the units and the amount they paid are as follows: Shares
Newport Amount Name of BRC
Warrants
Percentage
Paid Alvin Glasky
20,000
40,000
.42553
$ 200,000
George Cook
10,000
20,000
.21277
100,000
Donald Arrington
5,000
10,000
.10638
50,000
Dudley B. Frank
5,000
10,000
.10638
50,000
Nathan L. Berkowitz
3,500
7,000
.07447
35,000
Charles Altschuler
3,500
7,000
.07447
35,000
Total
47,000
94,000
1.00000
470,000
The proceeds of the sale of the above units, $ 470,000, were deposited into BRC's checking account at the *636 Tustin Branch of the Lloyds Bank of California. During December 1981, BRC issued four checks to Newport drawn on this account, in the total amount of $ 465,000. The record does not state whether Newport received any consideration for the sale of the warrants to purchase its stock, which were included in the above units. Dr. Alvin Glasky, Mr. Sanford Glasky, and Mr. Ronald P. Arrington were elected to BRC's board of directors on December 3, 1981. Dr. Glasky was also elected president and secretary of the corporation. Mr. Sanford Glasky and Mr. Arrington were elected treasurer and assistant secretary, respectively. These individuals served as officers and directors of BRC until October 27, 1986. On December 11, 1981, BRC and Newport entered into an agreement entitled "Research, Development and License Agreement" (herein referred to as BRC Research Agreement). The terms of this agreement are substantially the same as the terms of the IRC and ARC research agreements, except that Exhibit A of this agreement, entitled "Goals and Objectives for Research on NPT-15392", describes the objectives of the research as follows: The objectives of this proposed study will be: 1) To determine *637 if repeated doses of NPT 15392 in a larger population (J100) of tumor patients will enhance the depressed immune response (as observed by NK cell activity, and T-cell type and number). 2) To determine whether repeated doses of 0.4, 0.7 mg or both are effective doses in restoring depressed immunity in tumor patients. The primary objective is to demonstrate the ability of repeated doses of NPT-15392 to restore depressed immunity in tumor patients.
On December 11, 1981, as contemplated in the offering circular, the shareholders of BRC and Newport also executed a "Put and Call Agreement" (herein referred to as BRC Put and Call Agreement). The terms of this agreement are substantially the same as the terms of the IRC and ARC put and call agreements. Under the BRC Put and Call Agreement, the shareholders of BRC are given the option for a 5-year period beginning on January 2, 1983, to exchange their BRC stock for 67,143 Newport shares, and Newport is given the option for a 7-year period beginning on July 1, 1982, to call all of the shares of BRC in exchange for 67,413 Newport shares. The number of Newport shares to be received in the exchange was subject to detailed *638 antidilution provisions similar to those set forth in the IRC and ARC put and call agreements. For taxable years 1981, 1982, and 1983, BRC filed small business corporation tax returns on Forms 1120-S and reported the following income, deductions, and losses: 1981
1982
1983
Income:
Gross receipts
-- -- -- Interest income
-- -- -- Total income
-- -- -- Deductions:
Research and development
$ 465,000 -- -- expenses
Franchise tax
-- $ 200 $ 200 Professional fees
-- 255 655 Total deductions
465,000 455 855 Taxable income (loss)
(465,000)
(455)
(855)
Schedules K-1, Shareholder's Share of Undistributed Taxable Income, etc., attached to BRC's returns report decedent's share of the above losses as follows: 1981
1982
1983
George Cook
($ 98,936)
($ 96)
($ 182)
The parties have stipulated that, during taxable year 1982, BRC paid a franchise tax and professional fees in the amounts of $ 299 and $ 55, respectively, rather than the amounts reported on its return, $ 200 and $ 255. For each of the taxable years 1984, 1985, and 1986, BRC reported a loss of $ 200 consisting of its payment of franchise taxes *639 in each year. On or about February 11, 1986, all of the BRC shareholders executed a series of resolutions under which they appointed an agent to exercise their put option, pursuant to the BRC Put and Call Agreement. On or about February 11, 1986, the agent, acting on behalf of the BRC shareholders, entered into an Agreement and Plan of Reorganization with Newport, as contemplated by the BRC Put and Call Agreement. The transaction contemplated under the Agreement and Plan of Reorganization was never closed, but the record does not make clear why. In any event, on May 1, 1986, Newport made a tender offer to acquire the stock of BRC in exchange for 67,143 shares of its common stock, the same number of shares called for under the BRC Put and Call Agreement. On or about May 9, 1986, all of the BRC shareholders accepted Newport's offer, and they exchanged their BRC shares for 67,143 shares of Newport stock. BRC became a wholly owned subsidiary of Newport. The terms of the Newport exchange offer, including the number of Newport shares offered in exchange for the BRC shares, were substantially the same as the terms the BRC shareholders would have otherwise received upon the exercise *640 of their put option under the BRC Put and Call Agreement. Annual Reports to the Securities and Exchange Commission
For each of the fiscal years ending April 30, 1980, through 1986, Newport filed a Form 10-K, Annual Report, with the Securities and Exchange Commission, pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934. These forms describe the NPT-15000 Series of compounds as jointly owned by Newport and Sloan-Kettering, under an agreement with Sloan-Kettering that gave Newport exclusive worldwide rights to develop, license, and market any products of the compounds. For example, the Form 10-K for the fiscal year ended April 30, 1983, states as follows: The Company [i.e., Newport] is the co-owner with Sloan-Kettering of rights to another series of experimental pharmaceutical compounds, designated the "NPT-15000 Series," which have demonstrated immunopharmacological and antiviral activity in preliminary laboratory and human testing. The agreement between the Registrant [i.e., Newport] and Sloan-Kettering provides that they will be the joint owners of any patents issued covering any of the compounds, and that the Company will have the exclusive right *641 to develop any commercial products therefrom, subject to Sloan-Kettering's right to receive a share of resulting income equal to 4% of the net sales of the products, 25% of license fees and 50% of royalties received by the Company.
The Forms 10-K filed by Newport describe the type of research contracts and options agreements that Newport had entered into with IRC, ARC, BRC, and other entities. For example, the Form 10-K for the fiscal year ended April 30, 1983, states as follows: A substantial portion of the Company's [i.e., Newport's] revenue during recent periods has been derived from research and development fees received from affiliated entities controlled by officers and directors of the Company, and from technical assistance fees from foreign licensees. Research contracts generally involve the funding of research and development of new or existing products by a funding entity in consideration of an agreement by the Company to pay royalties to the funding entity in an amount equal to an agreed percentage of revenues subsequently received by the Company from future sales of the product in question. Such arrangements have traditionally been entered into with subchapter *642 S corporations or limited partnerships, the investors of which are allowed current deductions against income (for federal income tax purposes) for expenditures made by the corporation or partnership under the research contract. The Company has an option to purchase the investors' interest in future revenues, which option serves as an effective limitation on the amount of revenue payable to the entities. Traditionally, such contracts have been entered into with entities controlled by officers and directors of the Company, and may not necessarily be of the recurring nature. See "Certain Relationships and Related Transactions."
The 1983 Form 10-K further describes these research and development contracts as follows: The Company [i.e., Newport] has from time to time in the past entered into research and development contracts with limited partnerships or other entities controlled by or affiliated with officers and directors of the Company. Such research and development contracts generally involve the funding of research and development of new or existing products in consideration of an agreement by the Company to pay to the funding entity an amount equal to an agreed percentage *643 of revenues subsequently received by the Company from future sales of the product or products in question. Such arrangements provide the Company with financial resources which it has historically been unable to generate internally, and which might otherwise have been unavailable. Generally such arrangements have been entered into with limited partnerships or Subchapter S corporations, the general and limited partners or shareholders of which are allowed current deductions against income (for federal income tax purposes) for expenditures made by the funding entity under the Research Contract. In such transactions in the past, the Company has been granted an option to purchase the limited partners' or shareholders' interest in revenues, which option serves as an effective limitation upon the amount of revenue payable to the funding entity. Certain offices and Directors of the Company identified below have frequently participated as investors in the funding entities, and although certain conflicts of interest are inherent in such transactions, each such transaction has been approved by a disinterested majority of the Company's Board of Directors, and Management is of the opinion *644 that the terms of each such transaction were no less favorable to the Company than would have been available from unaffiliated third parties.
According to the 1983 Form 10-K, Newport had entered into research contracts with the following entities: Newport Research Associates, Ltd. Newport Research Associates - 1978 IRC Viral Potentiator Research Corp.
ARC
BRC Biological Research Corp. II
Grantor Trusts
As mentioned above, decedent's stock in IRC was held by two grantor trusts, NP Discovery Trust and NP Breakthrough Trust. Both trusts were formed by a single trust instrument, which was executed by decedent on July 23, 1979. Decedent's spouse and his son Dan were the beneficiaries of NP Discovery Trust. Decedent's spouse and his other son, Bradford, were the beneficiaries of the NP Breakthrough Trust. The trustee of both trusts was Mr. Burton W. Kanter. Both trusts filed income tax returns on Forms 1041, U.S. Fiduciary Income Tax Return for 1979, 1980, 1981, and 1982. The returns filed by NP Discovery Trust report the following losses and expense: 1979 1980 1981 1982 Immunological (loss)
($ 163,937)
($ 5,770)
($ 375)
($ 838)
Immunological Marketing
-- (19)
(50)
(31)
Services (loss)
Miscellaneous expense
-- 2 -- -- *645 The returns filed by NP Breakthrough Trust report the following losses and expenses: 1979 1980 1981 1982 Immunological (loss)
($ 163,937)
($ 5,770)
($ 375)
($ 838)
Immunological Marketing
-- (19)
(51)
(31)
Services (loss)
Miscellaneous expense
-- 1 -- -- Decedent's Returns and Respondent's Adjustments
Decedent and his wife filed joint Federal income tax returns for 1979 through and including 1982. Attached to each of those returns is a Schedule E, Supplemental Income Schedule. Decedent and his wife claimed the following losses on the part of the Schedules E which reports income or losses from partnerships, estates or trusts, and small business corporations: 1979 1980 1981
1982 N.P. Discovery Trust
$ 163,937
$ 2
$ 425
$ 838
N.P. Breakthrough Trust
163,937
1
426
31
Immunological Research Corp.
11,540
Immunological Marketing Service, Inc.
38
Antiviral Research Corp.
134,000
103
2,866
Biological Research Corp.
98,936
96
327,874
145,581
99,890
3,831
Respondent disallowed the above losses. The 1981 tax return reports long-term capital gain of $ 184,257 from the sale of decedent's stock *646 in Delphi International Oil Corp. The 1981 return also reports that decedent had acquired the stock on "6-19-79" and that his cost or other basis in the stock was $ 16,125. It states that the stock was sold on November 10, 1981, for $ 200,382. Respondent determined in the notice of deficiency that decedent's basis in this stock was $ 10,500 rather than $ 16,125, and increased decedent's net long-term capital gain by $ 5,625. OPINION During the years in issue, decedent, or grantor trusts established by decedent, held stock in three subchapter S corporations, IRC, ARC, and BRC. Decedent and his spouse claimed a proportionate share of certain expenditures made by the corporations as deductions under sections 162 or 174. Among other adjustments made in the subject notice of deficiency, respondent disallowed the following deductions claimed by decedent and his wife on the Schedules E which were filed with their returns: 1979 1980 1981
1982 Total Research and development
$ 326,668
$ 134,000
$ 98,936
--
$ 559,604
expenses under sec. 174
Miscellaneous business
1,206
11,543
853
3,800
17,402
expenses under sec. 162
Immunological Marketing
--
38
101
31
170
Services, Inc.
Total
327,874
145,581
99,890
3,831
577,176
*647 Petitioners bear the burden of proving that respondent's determination is wrong. Rule 142, Tax Court Rules of Practice and Procedure. Hereinafter all Rule references are to the Tax Court Rules of Practice and Procedure. Immunological Marketing Services, Inc.
At the outset, we note that the returns on Forms 1041, U.S. Fiduciary Income Tax Return, filed on behalf of N.P. Discovery Trust and N.P. Breakthrough Trust report the following losses from Immunological Marketing Services, Inc.: 1979
1980
1981
1982
Total
NP Discovery Trust
--
($ 19)
($ 50)
($ 31)
($ 100)
NP Breakthrough Trust
--
(19)
(51)
(31)
(101)
Total
--
(38)
(101)
(62)
(201)
We also note that decedent and his wife deducted only $ 170 of those losses on their Schedules E, Supplemental Income Schedules. Their Schedule E for 1980 claims a deduction of $ 38 that is labeled Immunological Marketing Service, Inc. Their Schedules E for 1981 and 1982 claim deductions of $ 101 and $ 31, respectively, that are part of the deductions labeled N.P. Discovery Trust and N.P. Breakthrough Trust. For some reason, decedent and his wife failed to deduct the loss of $ 31 reported by NP Discovery *648 Trust in 1982. It appears that Immunological Marketing Services, Inc., like IRC, is a subchapter S corporation and that each of the above amounts is the trust's share of the loss realized by the corporation. The record of this case does not set forth the percentage share of the stock of Immunological Marketing Services, Inc., owned by each trust. The second stipulation of settled issues filed by the parties states as follows: 1. Respondent concedes that Immunological Marketing Services was entitled to deduct miscellaneous expenses in the amounts of $ 38.00, $ 101.00 and $ 31.00 for the taxable years 1980, 1981 and 1982, respectively.
We assume from the above that respondent also concedes that decedent and his wife are entitled to deduct $ 38, $ 101, and $ 31 for the taxable years 1980, 1981, and 1982, respectively. Accordingly, we do not further address this issue. Research and Experimental Expenditures -- Section 174
The principal issue in this case is whether decedent and his wife are entitled to deduct, as "research or experimental expenditures" under section 174, a share of payments made by IRC, ARC, and BRC under so-called Research, Development and License *649 Agreements between each of those corporations and Newport. IRC paid $ 980,000 to Newport in 1979 under its research agreement with Newport, ARC paid $ 900,000 in 1980 and 1981 under its research agreement with Newport, and BRC paid $ 465,000 in 1981 under its research agreement with Newport. The portions of those amounts that decedent and his wife treated as deductions under section 174(a)(1) are $ 326,668 in 1979, $ 134,000 in 1980, and $ 98,936 in 1981. In the subject notice of deficiency, respondent disallowed the deductions claimed on the ground that decedent and his wife had failed to establish that they are entitled to the deductions under section 174. The notice of deficiency gives the following additional reasons: The deductions that were claimed are disallowed because no research or experimental expenditures were made in connection with a trade or business. Expenditures were not made for the designated purposes. The alleged transactions lacked economic purpose and substance that would justify the deductions that you claimed. The investment would never result in more than purely passive participation on your part. Moreover, you were not at risk in the amounts *650 deducted.
On brief, respondent takes the position that the subject payments are capital contributions to Newport which were disguised as payments for research in order to give decedent and the other shareholders of the subchapter S corporations a tax deduction. Respondent argues: The Corporations were merely passive vehicles created to finance the research activities of Newport and to provide the shareholders of the Corporations with colorable claims to tax deductions for what in substance constituted capital contributions to Newport.
According to respondent, none of the subchapter S corporations ever engaged in a trade or business growing out of the research activities of Newport, and several factors make it clear that none of them ever intended to engage in such a trade or business. These include: The fact that the coowner of the patent on the NPT 15000 Series of compounds, Sloan-Kettering, did not join the three research agreements; the fact that each of the subchapter S corporations gave an exclusive license to Newport under its research agreement; and the existence of the put and call agreements between each of the three subchapter S corporations and Newport. *651 Respondent makes three other arguments. First, she argues that none of the subchapter S corporations undertook its activities with an actual and honest objective of making a profit under section 183, and, thus, none of them engaged in a trade or business. Second, she argues that the payments at issue do not qualify as "research or experimental expenditures" because the end-product of the research or experimentation was never made available to any of the three subchapter S corporations for use in its trade or business, as required by section 1.174-2(a)(2), Income Tax Regs. Third, she argues that decedent and his wife were not at risk within the meaning of section 465 with respect to their share of the losses of any of the three subchapter S corporations. In response to respondent's position that none of the three subchapter S corporations ever engaged in a trade or business, petitioners acknowledge that section 174 requires "the existence of a trade or business before the deductions at issue may be utilized." They also acknowledge that "Petitioners' entities" never generated revenue from their activities and, thus, did not "satisfy the objective standard for trade or business classification *652 required by Section 162." Nevertheless, petitioners contend that each of the subchapter S corporations satisfies the trade or business requirement of section 174 because there was a realistic prospect that the corporation would engage in a trade or business involving the subject research. We describe petitioners' position in greater detail below. For the reasons set forth below, we agree with respondent that none of the three subchapter S corporations made the subject expenditures in connection with a trade or business of its own. Accordingly, we agree with respondent that petitioners are not entitled to the subject deductions under section 174. We do not reach the other issues raised by respondent. Section 174 permits a taxpayer to treat "research or experimental expenditures" that are paid or incurred during the taxable year as expenses that are not chargeable to a capital account and are allowed as a deduction, or it allows the taxpayer to elect to treat such expenditures as deferred expenses that may be deducted ratably over a period of not less than 60 months. Sec. 174(a) and (b). In this case, each of the subchapter S corporations treated the amounts paid under its research *653 agreement with Newport as a research or experimental expenditure that is not chargeable to a capital account and that is allowed as a current deduction, pursuant to section 174(a). In any event, in order to be eligible for either of the alternative methods of treating research or experimental expenditures, section 174 requires the research or experimental expenditures to have been paid or incurred by the taxpayer "in connection with his trade or business". Sec. 174(a)(1) and (b)(1)(A). For this purpose, the "taxpayer" is the entity that made the expenditure. See Levin v. Commissioner, 832 F.2d 403, 405 (7th Cir. 1987), affg. 87 T.C. 698 (1986). Therefore, in this case, petitioners must prove that each of the subchapter S corporations made the subject payments to Newport "in connection with" a trade or business of its own. In this regard, section 174 differs from section 162. Under section 162, a taxpayer is allowed to deduct ordinary and necessary expenses paid or incurred during the taxable year "in carrying on any trade or business". Thus, in order to be allowed a deduction under section 162, the taxpayer must actually *654 be engaged "in carrying on" a trade or business. The taxpayer must show that his activities were sufficiently substantial, regular, or continuous to constitute a trade or business, Commissioner v. Groetzinger, 480 U.S. 23 (1987), and that he undertook those activities to make a profit, Zink v. United States, 929 F.2d 1015, 1021 (5th Cir. 1991). Unlike under section 162, an expenditure may be deductible under section 174 even though the taxpayer is not carrying on a trade or business at the time the expenditure is made, as long as the expenditure is made "in connection with" the taxpayer's trade or business. Snow v. Commissioner, 416 U.S. 500, 503 (1974); United Fiber Tech, Ltd. v. Commissioner, 976 F.2d 445, 446 (8th Cir. 1992), affg. T.C. Memo. 1991-445. The taxpayer must show that there is a realistic prospect that the taxpayer will ultimately engage in his own trade or business that exploits the fruits of the research and experimental expenditure. E.g., Kantor v. Commissioner, 998 F.2d 1514 (9th Cir. 1993), *655 affg. in part and revg. in part T.C. Memo. 1990-380; Zink v. United States, supra at 1023; Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988), affg. T.C. Memo. 1986-403. This is a factual inquiry, but two principal factors determine whether there is a realistic prospect that the taxpayer will enter a trade or business exploiting the developed technology: (1) The objective intent to enter such a trade or business; and (2) a capability of doing so. See Kantor v. Commissioner, supra; Medical Mobility Ltd. Partnership I v. Commissioner, T.C. Memo. 1993-428. In this case, petitioners concede that the activities of none of the three subchapter S corporations were sufficiently substantial, regular, or continuous to constitute a trade or business. See Commissioner v. Groetzinger, supra. Their opening brief states as follows: In none of the cases [on which respondent relies, Green v. Commissioner, 83 T.C. 667 (1984); Spellman v. Commissioner, supra; *656 and Levin v. Commissioner, supra], could the taxpayers any more than the taxpayers in Snow (or petitioners' entities) satisfy the objective standard for trade or business classification required by section 162. [Emphasis supplied.]
The activities of each of the subchapter S corporations were purely ministerial. Each of the three corporations realized only a small amount of interest income before it was acquired by Newport as a subsidiary, and, other than the expenditures at issue, each incurred only administrative and professional expenses during that time. The corporations did not direct or supervise the research, and they played no role in the conduct of the research of NPT-15392. Additionally, there is no evidence that the officers, directors, or employees of any of the three subchapter S corporations conducted any business activities on behalf of the corporation. In the case of ARC, Ms. Grogan and Ms. Meyers were the only officers and directors of the corporation. They were full-time employees of Mr. Kanter's law firm, as an accountant and an administrative assistant, respectively, and neither of them had any expertise or *657 experience in the pharmaceutical business. The services that they performed for both ARC and IRC were ministerial tasks such as bookkeeping, accounting, and execution of documents. They were paid no compensation by the corporations. They exercised their signing capacities under the direction of Mr. Kanter. They generally made no independent decisions and acted only on instructions from Mr. Kanter. In the case of IRC, the only officers and directors of the corporation were Mr. Kanter, Ms. Grogan, and Ms. Meyers. The services performed by Ms. Grogan and Ms. Meyers on behalf of IRC were similar to those performed on behalf of ARC. There is also no evidence that Mr. Kanter engaged in any business activities on behalf of IRC. Neither Mr. Kanter, Ms. Grogan, nor Ms. Meyer testified at trial. In the case of BRC, Dr. Glasky, Mr. S. Glasky, and Mr. Arrington served as officers and directors. All of these individuals were also officers and directors of Newport. No other person was employed by BRC. Both Dr. Glasky and Mr. Arrington testified at trial, but neither of them testified to conducting business activities on behalf of BRC. Notwithstanding the fact that none of the subchapter *658 S corporations was carrying on a trade or business, petitioners contend that all of the subchapter S corporations intended to carry on a trade or business and had the capability to do so. Thus, in effect, petitioners contend that there was a "realistic prospect" that each of the subchapter S corporations would enter a trade or business to exploit the results of the research and experimentation acquired from Newport. According to petitioners, this is true for a number of reasons, including: The fact that, unlike certain cases cited by respondent, "the documentation did not, as a legal or practical matter, preclude the S Corporations from commercializing the research it (sic) owned and Newport developed" but "was drafted to insure that ownership would not be transferred"; the fact that "the entities involved at all times intended to carry on a trade or business and had the capability to do so"; and, the fact that "the S Corporations, through its (sic) investors, maintained an active business presence vis-a-vis its (sic) research and development activity." We disagree. We do not believe that there was a realistic prospect that any of the three subchapter S corporations would engage *659 in a trade or business that utilized the subject research. Petitioners' first point is that "the documentation did not, as a legal or practical matter, preclude the S Corporations" from using the research in a trade or business. That argument misses the mark because even if we were to find that the subchapter S corporations were not absolutely "precluded" from using the research in a trade or business, that would not be enough. Kantor v. Commissioner, 998 F.2d 1514 (9th Cir. 1993); Diamond v. Commissioner, 930 F.2d 372, 375 (4th Cir. 1991), affg. 92 T.C. 423 (1989); Levin v. Commissioner, 832 F.2d at 406-407. We must find both that the taxpayer was legally entitled to engage in a trade or business exploiting the subject research, and that it was probable that the taxpayer would do so. E.g., Kantor v. Commissioner, supra; Levin v. Commissioner, supra at 406-407; Spellman v. Commissioner, 845 F.2d at 150-151. In any event, we are not satisfied that any of the *660 subchapter S corporations obtained ownership rights to the research conducted by Newport that could be commercially exploited in a trade or business. The ownership rights given to each of the subchapter S corporations under its research agreement with Newport are as follows: Any and all products, processes, compounds, inventions, ideas, patents, patent rights, technical information, data and other proprietary know-how resulting or deriving from the Project, including all improvements thereto, and any other rights to commercially exploit the Project and the products and results thereof, including but not limited to, licensing and distribution rights, shall be the sole and exclusive property of the Corporation [i.e., IRC, ARC, or BRC.]
These ownership rights, however, are subject to the following proviso: provided, however, the Corporation [i.e., IRC, ARC, or BRC] shall have no ownership right or rights which may be deemed to be a sub-license to the extent that any of the foregoing constitutes a "Patent Right" or an invention or improvement covered thereby as defined in the agreement dated March 28, 1978 between Newport and Sloan-Kettering Institute or is covered by the *661 Assignment Agreement between Newport and Paul Gordon dated April 26, 1971 (collectively the "Prior Agreements").
The parties have stipulated that the NPT-15000 Series of pharmaceutical compounds is covered by "the agreement dated March 28, 1978 between Newport and Sloan-Kettering", referred to above. That agreement recognizes that Newport and Sloan-Kettering each own an undivided one-half interest in certain inventions developed through their joint efforts. The agreement provides a mechanism under which the inventions and improvements will be patented and exploited for the mutual benefit of Newport and Sloan-Kettering. The above-quoted proviso contained in each of the research agreements with Newport states that the subchapter S corporation received "no ownership right or rights" in anything that "constitues a 'Patent Right' or an invention or improvement covered thereby" as defined in the agreement dated March 28, 1978, between Newport and Sloan-Kettering. The definition of the term "Patent Rights" in that agreement is as follows: a. Any U.S. patent application hereafter filed covering any invention or improvement resulting from the Collaborative Effort, any division, *662 continuation, and continuation-in-part of any such application, and any patent which shall issue based on such application, division, continuation, and continuation-in-part; b. Any patent which is a reissue or an extension of, or a patent of addition to, any patent defined in (a) above; and c. Any patent application or patent corresponding to any patent application or patent identified in (a) or (b) above which is hereafter filed or issued in any country.
In light of this definition, it is hard to visualize that any of the three subchapter S corporations obtained ownership of anything that could be commercially exploited in a trade or business. Furthermore, we note that the agreement dated March 28, 1978, between Newport and Sloan-Kettering gives Newport the exclusive worldwide rights to exploit the patent rights covering the NPT-15000 Series of compounds. The agreement further provides: If the Patent Rights, or any portion thereof, are exploited by licensing third parties, SKI and Newport shall jointly license any such third party upon mutually agreeable terms and conditions in compliance with [SKI's patent agreement with the United States Department of Health, *663 Education and Welfare]. * * * All such license agreements must be jointly signed by SKI and Newport.
Sloan-Kettering did not join any of the research agreements between Newport and the three subchapter S corporations. Therefore, the research agreements could not constitute a license of any patent rights involving the NPT-15000 Series of compounds. Our conclusion that the subchapter S corporations received no ownership rights under the research agreements that could be exploited commercially is supported by the Forms 10-K filed by Newport with the Securities and Exchange Commission for its fiscal years 1980 through 1986. Each of those documents states that Newport "is the co-owner with Sloan-Kettering of rights to another series of experimental pharmaceutical compounds, designated the 'NPT-15000 Series'". None of them states that any rights to the NPT-15000 Series of pharmaceutical compounds are the "sole and exclusive property" of any of the three subchapter S corporations, as provided in the research agreements. The 10-K forms describe the research agreements as arrangements under which "a funding entity," i.e., each of the subchapter S corporations, provided funding *664 for research and development "in consideration of an agreement by the Company [i.e., Newport] to pay royalties to the funding entity". It is clear that the subchapter S corporations are not entitled to deductions under section 174(a) if they merely financed Newport's research in exchange for royalties. E.g., Spellman v. Commissioner, 845 F.2d at 150. Even if we were to accept petitioner's position that the subchapter S corporations received more than a royalty interest in the research conducted by Newport, we still cannot accept petitioners' assertion that the three subchapter S corporations intended to carry on a trade or business and had the capability to do so. In subscribing to purchase stock in the three subchapter S corporations, all of the stockholders authorized an agent to execute a put and call agreement with Newport on his or her behalf. Under each of the put and call agreements, the shareholder gave his or her shares in the subchapter S corporation to the agent, along with an executed stock power in Newport's favor, and further authorized the agent to transfer the stock to Newport upon exercise of the put option by shareholders holding *665 at least 80 percent of the shares of the corporation or upon exercise of the call option by Newport. In the case of each of the subchapter S corporations, the existence of the put and call agreement made it unlikely that any of the three subchapter S corporations would ever utilize the research conducted by Newport in a trade or business. If the research were sufficiently successful to require the payment of royalties, then it would be likely that Newport would exercise its call option. This possibility was contemplated in the Forms 10-K filed by Newport, which state that Newport "has an option to purchase the investors' interest in future revenues, which option serves as an effective limitation on the amount of revenue payable to the entities." The effect of the call option was also recognized by decedent who testified as follows: Q As a director of Newport are you aware why he wanted such a call? A I have no idea. Q If you recall, would you state your idea? A If this was as successful as we thought it could be and anything like $ 100,000,000 of sales at a quarter of 1 percent, that is 2 and a half million dollars. The company wouldn't like to give that away. If *666 this was as successful as they thought it could be they wouldn't want to have that obligation. Q If they would not want to have that obligation how would the call have solved that problem for them? A They would have to give stock. Then if stock, they could either pay a dividend or not, that is another problem.
On the other hand, if the research were not sufficiently successful to lead to the payment of royalties, then the shareholders of each of the subchapter S corporations would be motivated to put their stock to Newport in exchange for Newport stock. Thus, it was likely that one option or the other would be exercised and that the shareholders of each of the subchapter S corporations ultimately would exchange their stock in the corporation for Newport stock. Accordingly, the put and call agreements made it unlikely that any of the subchapter S corporations would ever engage in a trade or business utilizing the Newport research. Cf. Diamond v. Commissioner, 930 F.2d at 375; Kantor v. Commissioner, 998 F.2d 1514 (9th Cir. 1993); Spellman v. Commissioner, 845 F.2d at 150-151. *667 Furthermore, after the initial capital contributions were expended, none of the subchapter S corporations had the resources to conduct further research or to finance such research. To be sure, the individual shareholders of each of the three subchapter S corporations might have had the resources to finance additional research and to provide working capital, but they were under no obligation to contribute additional capital to the corporations. Moreover, in view of the fact that each of the put and call agreements fixed the number of Newport shares to be received upon exercise of the put or call options, there was no incentive for any of the shareholders to contribute additional capital to the corporation. Thus, we find that the existence of the put and call options strengthens our conclusion that none of the subchapter S corporations had the capability of entering a trade or business to exploit the research conducted by Newport. We also note evidence in the record that suggests that the stockholders of the three subchapter S corporations wanted to acquire Newport stock. First, all of the individuals who subscribed to the stock of the three subchapter S corporations also received *668 warrants to purchase Newport stock. In fact, the units issued in the BRC offering were composed of one share of BRC stock and two warrants to purchase shares of Newport stock. Second, respondent introduced at trial the testimony of Dr. Charles Altschuler, who stated that his purpose for investing in BRC was to obtain Newport stock. Third, most of the individuals who subscribed to the stock of the three subchapter S corporations were officers or directors of Newport. Fourth, each of the put and call agreements contained elaborate antidilution provisions. Last, all of the shareholders of each of the three subchapter S corporations ultimately did exchange their stock in the subchapter S corporation for Newport stock. We also disagree with petitioners' final contention that the actions of "investors" in the subchapter S corporations establish that the subject expenditures were made in connection with the corporations' trade or business. The actions identified by petitioners are the following: 1. Investigatory work to determine the economic potential of the transactions; 2. the negotiation and consummation of the transactions; 3. the monitoring of the research; and *669 4. the understanding that contingency plans existed to exploit the research if the license agreement with Newport expired or was terminated.
Petitioners make a detailed review of the actions that decedent took to investigate the efficacy of Newport's research, including his discussions with an eminent Biochemist, the head of the board of governors of the Mayo Clinic, and the chairman of the board of a large pharmaceutical conglomerate. Petitioners also review the actions that decedent took in negotiating the transaction and in monitoring it. However, all of these actions are consistent with actions of an investor in a corporation formed to hold a royalty interest. We are not persuaded that those actions prove that any of the subchapter S corporations was formed to conduct a trade or business. Based on the facts and circumstances of this case, we agree with respondent that the three subchapter S corporations did not have the ability to, nor did they intend to, nor was there a reasonable prospect that they would, engage in a trade or business. Therefore, we hold that the research or experimental expenditures decedent and his wife claimed were not incurred "in connection *670 with" the trade or business of any of the corporations, and decedent and his wife are not entitled to deduct their share of such expenditures under section 174. Miscellaneous Business Expenses -- Section 162
IRC, ARC, and BRC made various expenditures during the taxable years 1979 through 1982 for bank charges, professional fees, corporate filing fees, franchise taxes, filing fees, and office supplies. The second issue for decision is whether decedent and his wife are entitled to deduct as ordinary and necessary business expenses under section 162 their pro rata share of those expenditures, viz, $ 1,206 in 1979, $ 11,543 in 1980, $ 853 in 1981, and $ 3,800 in 1982. Petitioners point to no evidence that any of the three subchapter S corporations were "carrying on" a trade or business, and that the subject expenses were paid or incurred in carrying on such trade or business, as required by section 162. Rather, they make the following argument in their post-trial brief: The prior discussion focused upon whether the research and development expenditures that were transmitted from the S Corporations to Newport were paid in connection with the trade or business of the *671 S Corporations. If, as Petitioners contend, the response to that question is affirmative, the deductions herein were similarly paid in connection with that trade or business. * * * Since these amounts were actually paid in connection with the trade or business of the S Corporations, they were properly deductible by the S Corporations and derivatively deductible by Petitioners. [Emphasis added.]
Thus, petitioners argue that their share of the subject expenditures is deductible under section 162 because the expenditures were paid or incurred by the three subchapter S corporations "in connection with" their trades or businesses. Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business". This is a more narrowly written provision than section 174, which allows a deduction for certain expenditures paid or incurred "in connection with * * * [the taxpayer's] trade or business". E.g., Snow v. Commissioner, 416 U.S. 500, 503 (1974). Thus, even if petitioners were correct that the three subchapter S corporations made the subject expenditures "in connection with" *672 their trades or businesses, that would not establish that the expenditures are also "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business", as required by section 162(a). In any event, as discussed above, we reject petitioners' argument that the alleged research or experimental expenditures were paid or incurred by the subchapter S corporations "in connection with" their trades or businesses. For similar reasons, we also reject petitioners' argument that the alleged business expenses were paid or incurred "in connection with" an ongoing trade or business of any of the subchapter S corporations. Accordingly, we sustain respondent and hold that decedent and his wife are not entitled to deduct their share of the miscellaneous expenditures made by the three subchapter S corporations. Adjusted Basis in Delphi International Oil Corp. Stock
The third issue involves the gain realized on the sale of decedent's stock in Delphi International Oil Corp. Schedule D of the tax return filed by decedent and his wife for 1981 reports the sale of "Delhi [sic] Inter Oil" stock, on "11-10-81" for $ 200,382. The return also reports that the stock was *673 purchased on "6-19-79" and that decedent's adjusted basis in the stock was $ 16,125. According to the return, decedent and his wife realized long-term capital gain on the transaction of $ 184,257. In the subject notice of deficiency, respondent determined that decedent's basis in the stock is $ 10,500, rather than $ 16,125. Accordingly, respondent increased decedent's long-term capital gain for 1981 by $ 5,625. Petitioners bear the burden of proving that respondent's determination of the stock basis is erroneous. Rule 142(a). At trial, decedent testified that he owned stock in Delphi Oil but that he did not remember the number of shares he owned. He stated that he first purchased stock in Delphi Oil "in the '60's, 1964 I believe was the date" and that he paid "around $ 14,000, some figure like that". He further testified that he acquired additional shares of Delphi Oil by exercising some stock rights and paying "$ 1400, some figure like that". He could not remember the exact figure he paid for this uncertain number of additional shares. Decedent testified that his basis in Delphi stock was the combined total of those two numbers, or $ 15,400. Petitioners offered no other *674 evidence concerning the purchase price of the shares that were disposed of in 1981. Petitioners do not explain how decedent and his wife computed the adjusted basis reported on their 1981 tax return, $ 16,125. Furthermore, petitioners do not explain why the 1981 return reports that the stock was purchased on June 19, 1979, rather than in 1964 as decedent testified. In short, we find too many discrepancies in the record to accept decedent's uncorroborated testimony. We are not bound to accept uncorroborated and unpersuasive testimony of interested parties or witnesses. See Smith v. Commissioner, 800 F.2d 930, 935 (9th Cir. 1986), affg. T.C. Memo. 1984-661; Fleischer v. Commissioner, 403 F.2d 403, 406 (2d Cir. 1968), affg. T.C. Memo. 1967-85; Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Therefore, we sustain respondent's determination that decedent's adjusted basis in the stock of Delphi Oil *675 was $ 10,500. Increased Interest Under Section 6621(c)
Respondent determined that the entire underpayment of tax for each of the years 1976 through 1982 is a "substantial underpayment attributable to tax motivated transactions" under section 6621(c). The last issue for decision in this case is whether petitioners are liable for increased interest under section 6621(c), as determined by respondent. Section 6621(c) was originally enacted as section 6621(d) by section 144 of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 682, and it was redesignated as section 6621(c) by section 1511(c) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. It applies to interest accruing after December 31, 1984, regardless of the date on which the return was filed. DEFRA sec. 144(c), 98 Stat. 684; Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 487 (Joint Committee Print 1984). We note that section 6621(c) was repealed effective for returns the due date for which is after December 31, 1989, determined without regard to extensions. Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, *676 sec. 7721(b), (d), 103 Stat. 2106, 2395. Section 6621(c)(1) provides, in the case of a substantial underpayment attributable to a tax-motivated transaction, that the annual rate of interest shall be 120 percent of the normal rate of interest applicable to an underpayment. For this purpose, a substantial underpayment attributable to a tax-motivated transaction is defined to mean an underpayment that is attributable to one or more tax-motivated transactions if the amount of the underpayment for the year exceeds $ 1,000. Sec. 6621(c)(2). Section 6621(c)(3) defines the phrase "tax motivated transactions" as follows: (3) Tax Motivated Transactions. -- (A) In General. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of *677 income for any period, and (v) any sham or fraudulent transaction.
(B) Regulatory Authority. -- The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated. In prescribing regulations under the preceding sentence, the Secretary shall take into account -- (i) the ratio of tax benefits to cash invested, (ii) the methods of promoting the use of this type of transaction, and (iii) other relevant considerations.
Pursuant to the authority given in section 6621(c)(3)(B), the Secretary promulgated section 301.6621-2T, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391-50392 (Dec. 28, 1984). Respondent takes the position that petitioners failed to meet their burden of proving that the underpayments for 1976 through 1982 were not attributable to tax-motivated transactions. Specifically, respondent contends that petitioners failed to prove: (1) That decedent was "at risk", within the meaning of section 465, with respect to the subject losses from *678 the subchapter S corporations; (2) that the losses were not based on sham transactions; and, (3) that the losses are not subject to the limitation prescribed by section 183 in the case of "an activity not engaged in for profit". As discussed above, we sustain respondent's determination that decedent and his wife are not entitled to deduct their share of the subject losses from the three subchapter S corporations. In doing so, it is not necessary for us to reach respondent's alternative contentions that decedent was not "at risk" with respect to his investment in any of the subchapter S corporations, that the deductions were based on sham transactions, or that the deductions resulted from an activity not engaged in for profit. We sustain respondent because we accept respondent's principal position that the subject expenditures were not paid or incurred "in connection with" the trade or business of any of the three subchapter S corporations. Thus, the losses are not deductible under section 174(a) to the extent that they are based on the alleged research or experimental expenditures, nor are they deductible under section 162(a) to the extent they are based on the alleged miscellaneous *679 business expenses. Our finding that the expenditures were not paid or incurred "in connection with" the payor's trade or business is not among the list of "tax motivated transactions" set forth in section 6621(c)(3) or in the regulations promulgated thereunder. Accordingly, this finding does not trigger the increased interest prescribed by section 6621(c), which applies only if the underpayment is attributable to "tax motivated transactions" within the meaning of section 6621(c)(3). Cf. Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). To reflect the foregoing, and concessions by the parties, Decision will be entered under Rule 155.