**Sharon D. KANTOR, Robert E. Kantor, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 91–70446.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1992.

Decided July 20, 1993.

---

David L. Gibson, San Francisco, CA, and Edwin G. Hubert, Tucson, AZ, for petitioners-appellants.

Robert L. Baker and Teresa T. Milton, Tax Div., U.S. Dept. of Justice, Washington, DC, for respondent-appellee.

Before: HUG, FLETCHER, and BRUNETTI, Circuit Judges.

HUG, Circuit Judge:

This case presents the question of whether research expenditures made by a partnership in order to develop a new technology were incurred in connection with its own trade or business, within the meaning of 26 U.S.C. § 174, where the partnership had contracted another firm to conduct the research and had granted that firm the opportunity to obtain for a nominal sum the exclusive right to market the technology. The Tax Court held they were not, and thus were not deductible as current expenses. We affirm this determination. The appellants also contend that the Tax Court lacked jurisdiction because of a defect in the notice of deficiency and challenge the Tax Court's imposition of negligence penalties. We conclude the notice of deficiency was adequate, affording jurisdiction, but reverse the imposition of the negligence penalties.

### I.

In 1981, appellants invested in PCS, Ltd., an Arizona limited partnership, whose stated purpose was to develop and exploit adaptations of an existing computer program called PRO–IV for use on various computer systems. On its tax return for that year, PCS, Ltd., claimed a $3.15 million deduction for research and experimentation expenses pursuant to 26 U.S.C. § 174, and posted an annual loss in excess of that amount. As limited partners, appellants claimed a distributive share of this loss as a "pass through" deduction on their 1981 joint income tax return.[1]

The Commissioner of Internal Revenue ("Commissioner") rejected appellants' deduction, determined a deficiency in their income tax, and assessed negligence penalties. Appellants subsequently sued the Commissioner in the United States Tax Court. The Commissioner did not dispute that the partnership's expenditures were incurred for research and experimentation, or that the enterprise was motivated by a genuine profit motive. Instead, the Commissioner determined that PCS, Ltd., had not incurred the expenditures in connection with a trade or business of its own as required by section 174 and that its partners therefore were not entitled to the deduction. The Tax Court affirmed the Commissioner's denial of the deduction and this appeal followed.

PCS, Ltd., was organized in 1981 by Edwin G. Hubert, who served as its general partner. In 1980, Hubert had learned of the PRO–IV software, tested it, and become interested in developing and exploiting adaptations of the program for use on various computer systems. At the time, Hubert had over 12 years of sales and technical experience in the computer industry. Hubert was unable to pursue the project on his own, however, because he was unable to secure a license to develop adaptations of the software from its owner, Data Technical Analysts, Inc. As a result, Hubert entered a series of business arrangements with two individuals, Merle Amundson and Calvin Lee, who had

successfully acquired such licenses. Over a period of time, Hubert formed a number of limited partnerships to fund the adaptation of PRO–IV for use on various computer systems. PCS, Ltd., was one of these limited partnerships. Amundson and Lee meanwhile formed a number of companies to actually develop these adaptations. PCS, Inc., is the company which they formed to develop and market the particular version of PRO–IV whose development was funded by PCS, Ltd.

The relationship between PCS, Ltd. ("the partnership"), and PCS, Inc. ("the research firm"), was governed by two contracts simultaneously executed in 1981. The first contract was the Research and Development Agreement. Under this agreement the research firm agreed to perform the research and development work necessary to convert PRO–IV to run on IBM computers, the partnership agreed to pay the firm with cash and promissory notes for that work, and the partnership retained ownership of any resulting software ("the software").

The second contract was the Technology Transfer Agreement. Under this agreement, the partnership granted the research firm the right to buy for $5,000 an option on an exclusive and worldwide license to market any item of software resulting from the research effort. In conjunction with this option, the partnership granted the research firm a 13–month review period in which it was entitled to evaluate the marketing potential of the software without any interference to its prospective rights by the partnership. If the research firm chose to exercise its option, it was to do so by providing written notice to the partnership before the end of the 13–month period. By exercising the option, the research firm would obtain the exclusive right to market the software and would obligate itself to pay the partnership specified royalties based on prospective sales of the software.

During the years following the execution of these agreements, the research firm conducted research and development of the software. Hubert meanwhile maintained involvement in

---

1. Under general principles of partnership and taxation law, a partnership does not, itself, pay taxes. Instead, the partners claim a pro-rata share of the partnership's profits and losses and each pays tax on his share. *See Diamond v. Commissioner,* 930 F.2d 372, 373 (4th Cir.1991).

the research effort: he kept in contact with the research firm's computer programmers, participated in strategic research decisions, reviewed research status reports, provided technical advice, and ultimately arranged a test site for the software. In 1983 and 1984, the research firm required additional financing to complete the research effort. Hubert negotiated an arrangement to secure such financing, which involved both the cancellation of the Technology Transfer Agreement and the appointment of Hubert to the research firm's board of directors. In late 1984, the research firm completed its research and development of the software. In early 1985, on behalf of the partnership, Hubert negotiated new license agreements under which a number of firms agreed to market the program on behalf of the partnership in Europe and North America. Finally, in 1987, the McDonnell Douglas Corporation purchased all rights associated with the software, including those of the partnership.

## II.

The Tax Court denied appellants' deduction because it concluded that in 1981 when the partnership made its research expenditure, it had no realistic prospect of marketing the resulting software in a business of its own. Appellants contend that the partnership not only had a prospect of conducting such a business, but actually did so.

Section 174 of the Internal Revenue Code permits a taxpayer to deduct from income "research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business." 26 U.S.C. § 174(a)(1).[2] Neither the Code nor the Treasury regulations, however, defines "in connection with his trade or business." Prior to 1974, the Commissioner and the Tax Court narrowly construed this provision to grant a deduction for research expenditures only to those taxpayers who, at the time of the expenditure, were already engaged in the business of selling products and services. In 1974, however, the Supreme Court held that the section 174 deduc-

tion is also available to up-and-coming enterprises whose only "business" at the time they incur research expenditures is the research itself. *Snow v. Commissioner,* 416 U.S. 500, 94 S.Ct. 1876, 40 L.Ed.2d 336 (1974).

The Court observed that the language contained in section 174, "in connection with [the taxpayer's] trade or business," is broader than the language of section 162, which allows a taxpayer to deduct ordinary and necessary expenses incurred "in carrying on any trade or business." *See* 26 U.S.C. § 162; *Snow,* 416 U.S. at 502–03, 94 S.Ct. at 1877–78. An expense is generally not deductible under section 162 unless the taxpayer is engaged in an ongoing business at the time the expense is incurred. *See, e.g., Madison Gas & Elec. Co. v. Commissioner,* 633 F.2d 512, 517 (7th Cir.1980). As a result, a nascent business may not deduct its "start-up" or "pre-operational" expenses under section 162 and must instead capitalize them. After reviewing the legislative history of section 174, the Court concluded that it was intended to modify this requirement by providing new businesses, which are not yet selling goods or services, an immediate deduction for their research and experimental expenditures. *Snow,* 416 U.S. at 502–04, 94 S.Ct. at 1877–79.

Subsequent courts have made clear, however, that section 174 does not authorize the deduction of every outlay that is used for research or experimentation. Although a taxpayer need not be conducting a trade or business at the time it incurs the research expenditure, the taxpayer must demonstrate a "realistic prospect" of subsequently entering its own business in connection with the fruits of the research, assuming that the research is successful. *See Zink v. United States,* 929 F.2d 1015, 1023 (5th Cir.1991); *Spellman v. Commissioner,* 845 F.2d 148, 149 (7th Cir.1988). We hold that a taxpayer demonstrates such a prospect by manifesting both the objective intent to enter such a business and the capability of doing so. *See Spellman,* 845 F.2d at 150–51; *Levin v. Com-*

---

**2.** We note that the "taxpayer" for this purpose is the partnership. *See Levin v. Commissioner,* 832

F.2d 403, 405 n. 2 (7th Cir.1987).

*missioner,* 832 F.2d 403, 406–07 (7th Cir. 1987); *see also United Fibertech, Ltd. v. Commissioner,* 976 F.2d 445, 446 (8th Cir. 1992) (per curiam); *Diamond v. Commissioner,* 930 F.2d 372, 375 (4th Cir.1991).

▮ In order to qualify for the section 174 deduction, a taxpayer's existing or prospective business must be its own and not that of another entity. *See Levin,* 832 F.2d at 405–06; *Green v. Commissioner,* 83 T.C. 667, 688–89, 1984 WL 15626 (1984). Tax law draws a fundamental distinction between engaging in a business of one's own and investing in the business of another. *See, e.g., Whipple v. Commissioner,* 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963); *Higgins v. Commissioner,* 312 U.S. 212, 218, 61 S.Ct. 475, 478, 85 L.Ed. 783 (1941). Where it appeared at the time of the research that a taxpayer's activities in connection with a new technology were unlikely to amount to any more than those of an investor, courts have denied the deduction. *See Diamond,* 930 F.2d at 376; *Zink,* 929 F.2d at 1022–23; *Spellman,* 845 F.2d at 150; *Levin,* 832 F.2d at 405–06.

▮ We believe that in the present case the Tax Court's conclusion is well supported: the partnership had no realistic prospect of engaging in its own trade or business in connection with the developed software at the time it incurred the research expenditures which appellants sought to deduct on their 1981 tax return. The Tax Court's conclusion primarily relied upon the agreements under which the partnership financed the research firm's development of the software, and granted the research firm the right to obtain, for the nominal sum of $5,000, an option on an exclusive license to market the software. These agreements, and other facts which existed at that time, sufficiently establish that the partnership had neither the objective intent nor the capability of entering such a business.

These agreements reveal that in 1981 the partnership was intended to be nothing more than an investment vehicle for a business that would be conducted by another entity. Under these agreements, the partnership delegated the work of developing the software to the research firm and effectively granted that firm the right to obtain exclusive marketing rights to the software for the nominal sum of $5,000. These agreements adequately support the conclusion that the partnership planned to provide money and ultimately hoped to receive royalties, but did not anticipate developing or marketing the software itself.

By granting the research firm the right to purchase a nominally priced option on an exclusive marketing license, moreover, the partnership rendered itself virtually incapable of becoming anything more than an investor. If the research firm purchased and exercised the option, it would be entitled to market the program indefinitely "on an exclusive and world-wide basis," and the partnership would be "total[lly] prohibit[ed from putting the program to] any [u]se whatsoever." By granting the research firm the right to purchase the option for a mere $5,000, and the right to exercise the option upon written notice, the partnership made it more probable than not that the research firm would exercise these rights if the software that resulted from the research was at all valuable.[3] Conversely, if the research firm actually declined to purchase such a nominally priced option, it is unlikely that the marketing of the software would have been economically feasible. *See Diamond,* 930 F.2d at 375; *Spellman,* 845 at 151. It appears unlikely, moreover, that the partnership would have had the resources to conduct such an effort itself.[4] *See Diamond,* 930 F.2d at 375; *Spellman,* 845 at 150–51.

Appellants argue that these agreements did not preclude the partnership from conducting a trade or business in connection

3. We note, in comparison, that PCS, Ltd., invested $3.15 million in the development of the program.

4. The Private Placement Memorandum ("PPM") issued by PCS, Ltd., indicated that the partnership anticipated raising $3,500,000 and spending

90% of that sum on research activities alone. The PPM also stated, as the Tax Court observed, that if PCS, Inc., chose not to market the resulting program, the partnership would lack sufficient capital to market and license the program directly to consumers.

with the software. They rely in part on the fact that the Technology Transfer Agreement did not grant the research firm an exclusive license to market the software, but rather the right to purchase an *option* on such a license. They contend, consequently, that at the time the agreements were executed there was a possibility that the option might not be purchased or exercised, that the exploitation rights would return to the partnership, and that the partnership might ultimately market the software itself. In support of their argument, they note that several years after the Technology Transfer Agreement was executed, it was cancelled and replaced by other licensing agreements.

■ Appellants' argument ultimately fails. In essence, the argument amounts to the proposition that at the time the agreements were entered, it was theoretically possible that the partnership might regain the right to market the product and actually do so. Courts have repeatedly held that while the probability of a firm's going into its own business will satisfy section 174, the mere possibility of its doing so will not. *See Diamond*, 930 F.2d at 375; *Spellman*, 845 F.2d at 150–51; *Levin*, 832 F.2d at 406–07. We note, moreover, that if we held the mere possibility of a firm's going into business to be sufficient, the holding would render meaningless the requirement of section 174 that research expenditures be made "in connection with [the taxpayer's] trade or business." Such a holding would swallow the rule and permit virtually any taxpayer to claim the deduction merely by theorizing circumstances under which it might one day go into business.

■ Appellants also contend that the partnership actually engaged in the business of developing and marketing the software through the 1981 to 1987 activities of its general partner, Hubert, and that they should therefore enjoy the deduction. We are not persuaded. First of all, our inquiry is limited to the tax year in which a taxpayer incurs its research expenditure and claims the section 174 deduction. *See Diamond*, 930 F.2d at 374–75; *Levin*, 832 at 406 n. 3. If a taxpayer is not engaged in a trade or business at that time, we look to whether it had a realistic prospect of doing so. Accordingly, because the partnership claimed its research deduction in 1981, Hubert's activities thereafter are only relevant to the extent they are indicative of the intent and capability, in 1981, of the partnership to enter into the trade or business of selling the product or service resulting from the research, if a marketable product was developed.

Even if we considered all of Hubert's activities, they are not indicative of an intent or capability of the partnership to enter into a trade or business of its own in 1981 or even thereafter. Hubert's identification of a marketable technology, his formation of a partnership to fund its development, and his negotiation of agreements under which other entities would develop and market it amount to the promotion and protection of a technological investment, not a business. Although Hubert provided technical information and advice to those individuals developing the software, those individuals were under the management and control of the research firm, an independent entity, not the partnership.[5] Hubert's activities with the research firm on behalf of the partnership were consistent with those of any investor who applies his knowledge and expertise to insure that an investment is successful; his activities did not indicate that the partnership was engaged in a trade or business or was ever designed to do so.

■ Finally, we note that Treasury Regulation § 1.174–2(a)(2) does not provide ap-

---

**5.** This point is reflected not only in trial testimony, but in the Research and Development Agreement itself. Section 13 of that agreement reads, in part:

> 13. *Independent Contractor.* [The research firm] shall at all times during the conduct of the Research Program be an independent contractor, maintaining sole and exclusive control over its personnel and operation. It is understood that all work performed by [the research firm] shall meet the specifications set forth in

this Agreement, and the detailed manner and method of doing the same shall be under the control of [the research firm], [the partnership] being interested only in the results obtained.... [I]t is further understood and agreed between the parties that the full and exclusive relationship between them is that of an independent contractor and nothing in this Agreement shall be construed to create any relationship between the parties other than that of an independent contractor.

pellants relief in this case. The regulation reads in relevant part:

> The provisions of [section 174] apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor).

Treas.Reg. § 1.174–2(a)(2) (1992). The language of the regulation makes clear that a taxpayer may enjoy the section 174 deduction for research conducted by another entity. Read in isolation, the regulation might suggest that the partnership is entitled to the deduction even though it engaged the research firm to conduct its research. The regulation, however, does not eliminate the trade or business requirement of section 174. If a partnership engages another firm to conduct its research, it must satisfy the trade or business requirement in some other way, such as by manufacturing or marketing the resulting technology. As we discussed above, the Tax Court properly concluded in this case that the partnership was unlikely to do so.

We conclude, therefore, that the Tax Court properly affirmed the Commissioner's denial of appellant's pass-through deduction from the PCS, Ltd., partnership.

### III.

Appellants raise two additional issues in this appeal: (A) the jurisdictional validity of the 1981 notice of deficiency disallowing their section 174 deduction, and (B) their liability for negligence penalties resulting from the disallowance of that deduction, pursuant to 26 U.S.C. § 6653(a).

### A.

On May 22, 1985, appellants received a notice of deficiency regarding their 1981 income taxes. The notice indicated that a deficiency of $3,497 and a negligence penalty of $174 had been assessed by the Commissioner based on the disallowance of their pass-through deduction from the PCS, Ltd., partnership. Appellants argue for the first time on appeal that this notice of deficiency was jurisdictionally invalid because the Com-

missioner failed to make an actual determination of their deficiency, as required by *Scar v. Commissioner,* 814 F.2d 1363, 1368–70 (9th Cir.1987). They assert, consequently, that the Commissioner did not establish jurisdiction to pursue a deficiency against them for that year. The Commissioner argues that appellants' claim is barred because it is raised for the first time on appeal, and that even if it is not barred, the notice was sufficient to establish jurisdiction.

"Subject matter jurisdiction cannot be conferred upon the court by consent or waiver." *Clapp v. Commissioner,* 875 F.2d 1396, 1398 (9th Cir.1989) (citing *Mansfield, C. & L. Mich. Ry. v. Swan,* 111 U.S. 379, 384, 4 S.Ct. 510, 512–13, 28 L.Ed. 462 (1884)). Consequently, we must consider the merits of appellants' jurisdictional argument, even though it was not raised below.

Before issuing a notice of deficiency pursuant to 26 U.S.C. § 6212(a), the Commissioner must make an actual determination of the taxpayer's liability. *Scar,* 814 F.2d at 1370. As a general rule, however, we will not "look behind a deficiency notice to question the Commissioner's motives and procedures leading to a determination." *Id.* at 1368.

We recognized an exception to this rule in *Scar,* where the notice of deficiency revealed on its face that a determination had not been made using the taxpayer's return. *Id.* The notice of deficiency stated that the Commissioner had disallowed deductions arising from a mining tax shelter with which the taxpayers had no connection. The attached documents indicated that the IRS knew that the taxpayers had filed a return for the year in issue, that the deficiency had been determined without examining the return, that the deficiency had therefore been computed using the maximum tax rate, and that the IRS would make appropriate adjustments when it examined the return. *Id.* at 1364–65. We concluded, on these facts, that the notice was jurisdictionally invalid.

We later emphasized in *Clapp v. Commissioner,* however, that the kind of review exercised in *Scar* is applicable "[o]nly where the notice of deficiency reveals *on its face* that the Commissioner failed to make a determination." 875 F.2d at 1402 (emphasis

added). In *Clapp*, we determined that the notices of deficiency were adequate to establish jurisdiction where they indicated various adjustments to income and the fact that these adjustments were based upon the disallowance of deductions. The taxpayers in *Clapp* attempted to show that the Commissioner had not made an actual determination of their deficiency by introducing internal IRS documents which suggested that at the time the notices were issued, the IRS had not decided which legal theory it would rely upon to secure a deficiency judgment. We nevertheless refused to question the Commissioner's determination because there was no indication on the face of the notices that a determination had not been made. *Id.* at 1400–01. The disallowed deductions did not refer to unrelated entities, nor had the tax rate been arbitrarily set.

After reviewing appellants' 1981 notice of deficiency, we conclude that it was sufficient to establish jurisdiction. The notice clearly indicates that appellants' PCS, Ltd., pass-through deduction of $12,500 was being disallowed, that their tax was being recomputed, and that a negligence penalty was being imposed. There is neither blatant error nor any statement which would suggest that the Commissioner had not made a determination using appellants' tax return.

Appellants attempt to argue that an actual determination of their tax liability had not been made at the time the notice was issued because the Commissioner did not determine for another year that PCS, Ltd., was not engaged in a trade or business pursuant to section 174. The only factual support they offer is the fact that during the Tax Court proceeding the Commissioner was forced to petition the court for an extension of time to file an answer to appellants' complaint. At best, appellants' argument is speculative. More importantly, under *Scar* and *Clapp*, we may not consider it because we find that the notice itself is not facially infirm.

We conclude, therefore, that the Commissioner's 1981 notice of deficiency to appellants was jurisdictionally valid.

### B.

Appellants also challenge a negligence penalty imposed by the Commissioner, pursuant to 26 U.S.C. § 6653(a), as a result of their denied section 174 deduction. The Tax Court held the penalty proper. We review the Tax Court's consideration of negligence penalties for clear error. *Norgaard v. Commissioner*, 939 F.2d 874, 877 (9th Cir. 1991).

Section 6653(a) of the Code permits the Commissioner to impose penalties upon a taxpayer where any part of an underpayment was due to negligence. We have defined negligence under this provision as "the lack of due care or the failure to do what a reasonable and prudent person would do under similar circumstances." *Allen v. Commissioner*, 925 F.2d 348, 353 (9th Cir.1991). The assessment of such a penalty is presumptively correct; the taxpayer against whom it is assessed has the burden of proving that her underpayment was not the result of negligence. *Id.*

We have applied this standard with varied results. In *Allen,* we found taxpayers negligent where there were sufficient warning signs that the charitable contribution scheme with which they were involved might not be legitimate, 925 F.2d at 353. By contrast, we found gambler-taxpayers not negligent in *Norgaard,* even though the Tax Court had invalidated their accounting scheme, because we concluded that the scheme was logical, 939 F.2d at 880. We also held that a taxpayer was not negligent where he lost on the merits but had good legal arguments. *Baxter v. Commissioner*, 816 F.2d 493, 496 (9th Cir.1987).

We find it difficult under the facts before us to conclude that appellants acted unreasonably by claiming the section 174 deduction. At the time they subscribed to the PCS, Ltd., partnership, the only case decided construing section 174 was *Snow v. Commissioner*, which did not squarely address the questions at issue here. The cases that began to clarify the limits on section 174 were not decided until years later. Though we ultimately conclude that appellants were not entitled to the section 174 deduction, the experience and involvement of the general partner, Hubert, with the PRO–IV project reasonably could have led investors, such as appellants, to believe that they were entitled to the deduction. At the time appellants

invested, there were few, if any, warning signs that they would not be entitled to the deduction.

We conclude, therefore, that the Tax Court clearly erred by affirming the imposition of the section 174 negligence penalty against appellants in 1981.

### IV.

The deficiency ordered due to the denial of appellants' 1981 pass-through deduction from PCS, Ltd., is affirmed. The negligence penalties imposed under the provisions of 26 U.S.C. § 6653(a) are reversed.

**AFFIRMED, in part, and REVERSED, in part.**