T.C. Memo. 2002-107


UNITED STATES TAX COURT


IMPACT RESEARCH CORPORATION, JOAN C. BENZ, TAX MATTERS PERSON,
    Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

RESEARCH IMPACT CORPORATION, JOAN C. BENZ, TAX MATTERS PERSON,
    Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14872-98, 14873-98.[1]    Filed April 29, 2002.


     S-1 and S-2 were S corporations formed to finance the
research and development activities of A, a nonpublicly
traded C corporation engaged in the business of developing
educational videodiscs. In a series of written agreements
between S-1, S-2, and A, (1) S-1 and S-2 acquired
proprietary rights in the results of the research which A
was to perform on their behalf, (2) A was obligated to pay
royalties to S-1 and S-2, and (3) A was given the option to

_____

     [1]The petition in each docket was filed by Frank Colenda, the
tax matters person of each of the named corporations.  After
trial and the filing of all briefs, the Court was notified that
Frank Colenda died.  After appropriate representations, we
granted petitioners' counsel's motion in both dockets to (1)
substitute Joan C. Benz for Frank Colenda as tax matters person
and (2) change captions to reflect this substitution.

buy all the assets of S-1 and S-2 in exchange for stock in A. S-1 and S-2 each deducted under sec. 174, I.R.C. 1954, the amounts each assertedly paid to A to conduct the research and development activities.

Held: Neither S-1 nor S-2 is entitled to a deduction under sec. 174, I.R.C. 1954, because the amounts S-1 and S-2 allegedly paid to A were not paid in connection with S-1's and S-2's respective trades or businesses.

Cheryl R. Frank and Gerald W. Kelly, Jr., for petitioners.

Lindsey D. Stellwagen, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, Judge: By separate notices of final S corporation administrative adjustment (hereinafter sometimes referred to as FSAA) respondent determined adjustments to the 1984 S corporation income tax returns of Impact Research Corporation (hereinafter sometimes referred to as IRC) and Research Impact Corporation (hereinafter sometimes referred to as RIC).[2]  For IRC, respondent

---

[2]This method of resolving disputes regarding subchapter S items was enacted by sec. 4 of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, 1691, 1697, effective for taxable years beginning after Dec. 31, 1982.  It was repealed by sec. 1307(c)(1) of the Small Business Job Protection Act of 1996, Pub. L. 104-188, 110 Stat. 1755, 1781, 1787, effective for taxable years beginning after Dec. 31, 1996.  The year in issue in the instant cases is 1984, a year to which this method continues to apply.  Thus, even though both of the FSAAs here involved were issued after the 1996 repeal, we concur with the parties' position that this Court has jurisdiction to resolve the parties' disputes in the instant cases.  See New York Football Giants, Inc. v. Commissioner, 117 T.C. 152, 154 n.3 (2001).

determined (1) a $241,700 adjustment[3] resulting from the disallowance of a deduction for research or experimental expenditures under section 174[4] and (2) an $80,000 adjustment eliminating IRC's reported short-term capital gain.  Petitioner in docket No. 14872-98 does not dispute the $80,000 adjustment.  For RIC, respondent determined a $631,289 adjustment resulting from the disallowance of a deduction for research or experimental expenditures under section 174.[5]

---

[3]Under the heading of "Detail of Adjustments To Ordinary Income", the FSAA for IRC shows a $241,700 adjustment to research and development expense.  Under the heading of "Other Adjustments", the FSAA shows a $221,558 adjustment to research and development expense and a $20,142 adjustment to qualified investment expenses, paralleling the treatment on Schedule K, Shareholders' Share of Income, Credits, Deductions, etc., of IRC's 1984 S corporation tax return; the sum of these adjustments is $241,700.  On brief, the parties treat this as one $241,700 adjustment.  For convenience, we follow the parties' one-adjustment terminology.  This does not affect our substantive analysis or our conclusions.

[4]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for 1984.

[5]Under the heading of "Detail of Adjustments To Ordinary Income", the FSAA for RIC shows a $631,289 adjustment to research and development expense.  Under the heading of "Other Adjustments", the FSAA shows a $594,192 adjustment to research and development expense and a $37,097 adjustment to qualified investment expenses, paralleling the treatment on Schedule K, Shareholders' Share of Income, Credits, Deductions, etc., of RIC's 1984 S corporation tax return; the sum of these adjustments is $631,289.  However, on a "STATEMENT I" of RIC's 1984 S corporation tax return, the deduction is broken down as follows: (1) "research-development exp"--631,000, and (2) "other exp"--289.  The parties do not appear to focus on the differences between these two breakdowns of the $631,289 total.  Because the
(continued...)

These cases have been consolidated for trial, briefs, and opinion. After a concession by respondent,[6] the issues for decision as to each of the S corporations are as follows:

(1) Whether the S corporation made research or experimental expenditures (within the meaning of section 174) in 1984 and, if so, then in what amount.

(2) Whether any such expenditures by the S corporation were made in connection with that corporation's trade or business.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.[7]

---

[5](...continued)
differences between these breakdowns do not affect our substantive analysis or our conclusions, for convenience, we treat respondent's determinations as one adjustment.

[6]Shortly before trial, respondent raised the question of whether IRC had a valid S corporation election under sec. 1362(a) in effect for 1984. Two months after the trial, the parties stipulated the document that constituted the election form and showed on its face that it had been timely received and accepted by respondent. Respondent thereupon conceded that IRC had a valid S corporation election in effect for 1984.

[7]Six of the stipulated exhibits were offered for limited purposes only and (as was made clear in the trial transcript) were received subject to those limitations. We have carefully observed those limitations in making our findings and arriving at our conclusions. See Fed. R. Evid. 105.

IRC and RIC had their respective principal places of business in Sterling, Virginia, when the respective petitions were filed in the instant cases. Both IRC and RIC were cash basis taxpayers; each reported on its respective 1984 information return that it had no income but claimed a deduction for research and development expenses (IRC--$241,700; RIC--$631,000). RIC claimed a $289 deduction for other expenses.

A.  Systems Impact, Inc.

In 1984, Systems Impact, Inc. (hereinafter sometimes referred to as Systems), was a nonpublicly traded C corporation seeking to develop interactive educational videodiscs, a relatively new technology at the time. Videodiscs are discs which contain information which users may access with a videodisc player. The videodisc player transmits the information contained in the videodisc to a computer monitor for display.

Systems sought to exploit the videodisc technology as an educational aid. Systems' videodiscs were about the size of a 78-rpm phonograph record; they contained information about various subjects including fractions, algebra, and earth science. As used in an educational setting, teachers could monitor student learning while the videodiscs presented the information to the students. Based on their observations, teachers could tailor the presentation of the information to what they perceived to be the needs of the students. For instance, if the class did not appear

to grasp a portion of a lesson, then the teacher could replay the unclear portion of the lesson in a step-by-step process to reinforce or clarify key principles; conversely, if the class appeared to understand the lesson, then the teacher could continue with the lesson. The videodiscs also enabled teachers to present the information contained in the videodiscs in more than one manner.

By 1984, Systems had developed early prototypes of the videodiscs, but it needed an additional $5-8 million to bring them to market.

B. Creation and Operation of IRC and RIC

In 1984, Gordon Gould (hereinafter sometimes referred to as Gould) was the president of Heritage Financial Corp. (hereinafter sometimes referred to as Heritage Financial). Heritage Financial was a securities firm; a broker-dealer, it sold stocks, bonds, and other forms of investments.

In 1984, Gould met with Systems' representatives about raising the financial support Systems needed in order to expand its research and development activities. Gould considered the videodisc technology to be a "valid potential product for investors". After consulting with securities attorneys, Gould and Systems agreed that the formation of two S corporations represented the best way to (1) provide to Systems the additional financing it needed, and (2) secure an equity investment in the

videodisc technology for shareholders in the to-be-formed S corporations.

Once Gould and Systems agreed to form the two S corporations, Gould began to locate potential shareholders in what would become IRC and RIC.  Gould tried to locate shareholders who would qualify under the private placement rules of the Securities Act of 1933.  To ensure qualification, prospective shareholders completed "investor qualification forms" which solicited the information necessary to determine whether potential shareholders satisfied the Securities and Exchange Commission's rules regarding private placement offerings.  The investor qualification forms provided information about the potential shareholder's balance sheets, income statements, tax returns, and experience with investing in private placements.  Potential shareholders in IRC and RIC had to have a minimum net worth of $200,000.  Gould reviewed the investor qualification form of each potential shareholder.  Shareholders in the S corporations were not selected on the basis of education and experience in manufacturing or in marketing.

A majority of the shareholders of IRC and RIC were professionals and had some managerial and business expertise. Frank Colenda (supra note 1) participated in the U.S. Navy's development of the "Sparrow" missile program.  Among the shareholders of RIC were the following:  Joan C. Benz, a Ph.D.,

who later became a high school principal; Francis E. Rundell, a retired U.S. Air Force colonel who managed missile research and development programs for the U.S. Air Force; and William A. Fleming, a former supervisor in the lunar lander program of the National Aeronautics and Space Administration and former supervisor in the Federal Aviation Administration.

On February 28, 1984, IRC was incorporated in Delaware.  IRC elected S corporation status for its first taxable year (the short period from Mar. 1 through Dec. 31, 1984); it reported its income using the cash method of accounting.

On March 5, 1984, IRC opened a checking account with Maryland National Bank.  IRC wrote four checks on that account: Two checks totaling $7,412 for legal fees and two checks totaling $20,900 to Heritage Financial for fees and commissions associated with the private placement of IRC stock.

On June 5, 1984, RIC was incorporated in Delaware.  RIC elected S corporation status for its first taxable year (the short period from June 5 through Dec. 31, 1984); it reported its income using the cash method of accounting.

In June of 1984, RIC opened a checking account with Maryland National Bank.  RIC wrote eight checks on that account:  Two checks totaling $32,588 for legal fees, one $80,000 check for the repayment of a loan, two checks totaling $12,069 for refunds of investments in RIC stock, one $10,000

check to Systems as a transfer of funds, and two checks totaling $91,960 to Heritage Financial for sales commissions and legal fees associated with the private placement of RIC stock. RIC transferred an additional $100,000 to Systems by debit memorandum and Systems transferred $20,000 to RIC. RIC also transferred to Systems $331,092 by means of seven debit memoranda. RIC closed its checking account with Maryland National Bank and transferred the remaining balance of the account, $5,086.80, to Systems by debit memorandum on or about December 10, 1984. RIC transferred a net of $426,178.80 to Systems from its Maryland National Bank checking account ($100,000 + 10,000 - 20,000 + 331,092 + 5,086.80).

On or about July 10, 1984, RIC opened a checking account with McLachlen National Bank. RIC did not write any checks on the account. RIC closed the account and transferred the remaining balance, $205,137.20, to Systems on August 24, 1984. RIC transferred $631,316 to Systems from its two checking accounts ($426,178.80 (Maryland National Account) + $205,137.20 (McLachlen National Account)).

Neither IRC nor RIC performed educational videodisc research or development activities through its own employees. For that matter, neither S corporation had any employees. IRC and RIC did not prepare any written marketing or business plans. Neither IRC nor RIC held corporate board meetings, owned physical assets,

owned or leased physical premises, or maintained inventory. Neither IRC nor RIC was adequately capitalized to market and license products, nor did either corporation make any provisions to raise additional capital. There are not any written documents reflecting that either IRC or RIC intended to enter the market for educational videodiscs.

C.   Agreements Among Systems, IRC, and RIC[8]

IRC entered into three agreements with Systems: (1) A research and development agreement (hereinafter sometimes referred to as the R & D Agreement), (2) an exclusive license agreement, and (3) an option agreement. On June 13, 1984, IRC and Systems amended the R & D Agreement to make RIC a party thereto.[9] At some point, IRC and Systems also amended the exclusive license agreement to make RIC a party thereto. See supra note 9. Also, at some point RIC became a party to an option agreement with Systems, but the record does not indicate

[8]In many instances, the entire agreements are physically in the record. Nevertheless, as explained supra note 7, our findings with respect to these agreements do not go beyond the stipulated limitations on the purposes for which the agreements were offered and received in evidence, except to the extent the findings are based on other evidence of record or on the parties' unobjected-to proposed findings.

[9]So stipulated. However, neither the parties' stipulations nor any other evidence in the record herein shows what RIC's obligations and benefits were under the R & D Agreement as so amended. For example, we cannot tell from the record whether it is more likely than not that RIC shared all or any of IRC's obligations and benefits under the R & D Agreement. But see infra note 10.

whether this was accomplished by an IRC-Systems amendment to the original option agreement or a separate RIC-Systems agreement.

1.   Research and Development Agreement

The R & D Agreement obligated IRC to pay to Systems a fixed fee of $875,000 in consideration of Systems' performance of research activities.[10]  In this connection, section 2.02 of the R & D Agreement provides as follows:

> 2.02. Payments.  In consideration for the performance of the Funded Research Effort, SII [Systems] shall receive a fixed fee of $875,000.00. Such fee shall be paid in seven (7) installments in accordance with the payment schedule set forth on Exhibit B, which hereby is incorporated herein and made a part hereof.  The obligation of IRC to make payments to SII pursuant to this Section 2.02 shall be contingent upon the delivery to IRC by SII of the monthly reports required pursuant to Section 4.01 hereof, and the absence of any default under Section 7.03 hereof.  In consideration of such fixed fee, SII shall complete the entire Funded Research Effort irrespective of the actual cost thereof.  Regardless of whether a commercially marketable technology or product results from the Funded Research Effort, no part of any

---

[10]We note that the FSAAs disallowed research or experimental expenditures deductions in the amounts of $241,700 (IRC) and $631,289 (RIC), for a total of $872,989.  This is very close to the $875,000 fixed fee provided for in the R & D Agreement. Also, this is almost exactly the $873,000 that petitioners ask us to find as IRC's and RIC's payment obligation under the R & D Agreement.  However, the parties have not enlightened us as to whether this is an indication that the June 13, 1984, amendment involved RIC's taking over some specified portion of IRC's original obligations under the R & D Agreement.  In light of the lack of record evidence as to what was involved in the June 13, 1984, amendment to the R & D Agreement, we cannot tell whether (1) petitioners intend to suggest that the June 13, 1984, amendment slightly reduced the contractual fee obligation, or (2) the $873,000 statement is merely petitioners' typographical error that went unnoticed by respondent.

such fixed fee shall be refundable to IRC except as provided in Section 8 hereof.

The Exhibit B payment schedule referred to in section 2.02 of the R & D Agreement provides as follows:

EXHIBIT B
to
RESEARCH AND DEVELOPMENT AGREEMENT

Impact Research Corporation shall make payments to Systems Impact, Inc. pursuant to the Research and Development Agreement according to the following schedule:

| Date | Amount of payment |
|---|---|
| No later than Mar. 19, 1984 | $151,000 |
| Apr. 1, 1984 | 149,000 |
| May 1, 1984 | 143,000 |
| June 1, 1984 | 137,000 |
| July 1, 1984 | 102,000 |
| Aug. 1, 1984 | 97,000 |
| Sept. 1, 1984 | 96,000 |
| TOTAL | 875,000 |

Any payments that IRC made to Systems were not made in accordance with the Exhibit B payment schedule.[11] Systems did not provide to IRC the monthly reports referenced in par. 2.02 of the R & D Agreement or any other written periodic reports, nor

---

[11]So stipulated. See supra note 10, as to our lack of information as to RIC's obligations. Also, the record does not indicate whether RIC made payments in accordance with any such obligations.

did Systems provide written periodic reports to RIC; however, Systems did provide a final report to both IRC and RIC. Systems conducted frequent meetings with Gould and invited shareholders of IRC and RIC to discuss the progress of the research. None of IRC's or RIC's shareholders became actively involved in, or monitored the substance of, Systems' research. However, one shareholder, Paul Smith, traveled once to Utah where the actual research was being performed.

The R & D Agreement further provides that IRC and RIC acquired proprietary rights in the results of Systems' research activities as follows:

> 6.01. Ownership in IRC [and RIC]. IRC [and RIC] shall have the full exclusive right, title and interest in and to all knowledge, developments, techniques, processes, discoveries, inventions, improvements, devices, designs, apparatuses, practices, methods, products and trade secrets of whatever nature, whether or not patentable, that are perfected, devised, conceived, developed, acquired or reduced to practice in performance of the [R & D] Agreement; provided, however, IRC's [and RIC's] rights in Preexisting Research shall be as provided in Section 3 hereof.[12]

The research under the R & D Agreement was not intended to, and did not result in, any commercially viable product.[13]

---

[12]Sec. 3 of the R & D Agreement was not offered and received into evidence.

[13]Petitioners ask us to make this finding. Respondent does not object. We treat this as the equivalent of a supplemental stipulation.

The R & D Agreement provides that it would terminate at the later of (1) the passage of 1 year, or (2) when Systems delivered a final report "acceptable to IRC".[14]

2.    Exclusive License Agreement

Under the exclusive license agreement, IRC transferred to Systems certain rights in exchange for a royalty interest. The exclusive license agreement obligated Systems to remit to IRC royalty payments equal to 10 percent of the gross revenues Systems derived from the sale of "Demonstration Discs" and "Core Concepts in Science and Mathematics" for the term of the exclusive license agreement, discussed below.  Systems was further obligated to remit to IRC royalties of 10 percent of the gross revenues Systems derived "from the sale of any other products based upon or embodying the Demonstration Discs", for a period of 5 years.  At some point, RIC became a party to the exclusive license agreement.

The term of the exclusive license agreement is set forth in section 2.04 thereof, which provides as follows:

2.04.    Duration.

(a) The Exclusive License shall continue in effect until such date (the "Date of Termination") as it is terminated, in whole or in part, in accordance with the following provisions.  Royalty Payments (as

---

[14]The record herein does not indicate whether the final report was acceptable to IRC (or, for that matter to RIC, supra note 9) or even whether Systems' delivery was late enough so that the R & D Agreement lasted longer than 1 year.

hereinafter defined in Section 5) accrued as of the Date of Termination shall remain due and payable notwithstanding termination.

(b)  Subject to the provisions of paragraph (c) of this Section 2.04, the Exclusive License shall terminate as to the Demonstration Discs upon the occurrence of any of the following events: (i) * * * [Systems] or an assignee pursuant to the terms hereof is adjudicated a bankrupt and ceases operations; (ii) there shall be a failure to make a Royalty Payment in accordance with Section 5 hereof for a period of at least twenty (20) days after the date on which the same is due and payable; (iii) * * * [Systems] fails to complete the Funded Research Effort (as defined in the R&D Agreement) within one (1) year from the date hereof; (iv) * * * [Systems] fails to complete the development of and to offer for sale to the public at least five (5) of the courses to be included in the Core Concepts in Science and Mathematics series on or before January 1, 1987; or (v) * * * [Systems] fails to develop and maintain in good faith policies and a program to protect the confidentiality of the Demonstration Discs and the technology relating thereto, pursuant to section 8 hereof.

(c)  If the Exclusive License has not terminated pursuant to the preceding provisions of this Section 2.04, it shall terminate on March 31, 1994 (the "Date of Termination").

Systems did not remit to either IRC or RIC any royalties in 1984.

3.  <u>Option Agreement</u>

On or about March 19, 1984, IRC and Systems entered into an agreement under which Systems had the option to buy IRC's assets in exchange for Systems' stock, but only if all of certain specified conditions were met.  One of these specified conditions was that Systems' notice of election to exercise the option "shall provide for the consummation of the sale of the assets of

IRC to * * * [Systems] on or before March 31, 1985."  At some point, RIC became a party to an option agreement with Systems.

Under an agreement dated March 2, 1984, among IRC and its shareholders, if Systems satisfied each of certain specified conditions, then IRC's shareholders were obligated to vote their shares to approve the proposed merger or assets acquisition.  The specified conditions in the March 2, 1984, IRC shareholders agreement are almost exactly the same as the specified conditions in the above-described option agreement  If Systems did not satisfy the foregoing conditions, then the terms of any agreement to merge or sell assets would be subject to negotiations.

On or about March 26, 1985, Systems' president asked that the option expiration date be extended from March 31, 1985, to May 31, 1985.  On or about March 29, 1985, the boards of directors of IRC and RIC refused the request for extension.

D.  Mergers of IRC and RIC Into Systems

Contentious merger negotiations between Systems, IRC, and RIC ensued after Systems' option to buy the stock of IRC and RIC expired on March 31, 1985.  The negotiations ultimately proved successful and a merger occurred.

_____

Both IRC and RIC were formed and operated primarily to furnish investment capital to Systems.  Neither IRC nor RIC spent money in 1984 for the purpose of research or development in a

trade or business that the respective S corporation was conducting in 1984 or that the respective S corporation expected or intended to conduct at any time after 1984.

OPINION

Respondent contends that neither IRC nor RIC is entitled to the section 174 deduction each claimed because petitioners have failed to carry their burdens of proving the following: (1) Either IRC or RIC paid research expenses in 1984,[15] (2) any expenses paid for by IRC or RIC in 1984 constitute research or experimental expenditures under section 174, and (3) any such expenditures were paid in connection with the respective S corporation's trade or business.  Respondent contends that

> To meet the "in connection with" requirement, petitioners
> must establish that * * * [the S corporations] had * * *
> realistic [prospects] of going into business [, and they
> must do so] by demonstrating both an objective intent and
> the current ability to enter the marketplace.

Respondent views petitioners' burdens as a series of "hurdles", every one of which must be surmounted by a petitioner in order for that petitioner to establish that that petitioner's S corporation is entitled to any part of its claimed deduction.

Petitioners contend that (1) the work that Systems performed on behalf of IRC and RIC qualifies under section 174 and should

---

[15]At one point on brief, respondent seems to contend that the failure of proof of 1984 expenditures applies to both IRC and RIC; at another point respondent applies this contention only to IRC.

be treated as having been performed by IRC and RIC; (2) IRC and RIC could have and would have entered the marketplace with the technology so developed, but for Systems' acquisition of IRC and RIC; and (3) IRC and RIC spent the necessary funds in 1984.

We agree with respondent that IRC and RIC did not pay the research expenses in connection with their respective trades or businesses, and so neither S corporation is entitled to its claimed section 174 deduction (see supra notes 3 and 5).

Section 174(a)(1)[16] permits a taxpayer to currently deduct research or experimental expenditures which the taxpayer pays or incurs during the taxable year in connection with the taxpayer's trade or business. (For these purposes, the taxpayers in the instant cases are IRC and RIC, even though they are pass-through entities.)

For IRC and RIC to be entitled to their claimed section 174 deductions, the record must show that (1) IRC and RIC made payments to Systems, (2) these payments were made in order to

---

[16]Sec. 174(a)(1) provides as follows:

SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES.

　(a) Treatment As Expenses.--

　　(1) In general.--A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

have Systems conduct research or experiments on behalf of IRC and RIC, and (3) this research or these experiments are in connection with IRC's or RIC's trade or business.  Failure to satisfy any of these requirements would lead to a conclusion that IRC and RIC are not entitled to their claimed section 174 deductions.  See Green v. Commissioner, 83 T.C. 667, 691 (1984).

We consider first the question of whether the expenditures were "paid or incurred * * * in connection with * * * [IRC's or RIC's] trade or business".  Sec. 174(a)(1).

In Snow v. Commissioner, 416 U.S. 500, 503 (1974), the Supreme Court contrasted the "in connection with" language of section 174 with the "in carrying on" language of section 162. The Supreme Court concluded that the difference in language meant that the requirements of section 174 were different from the requirements of section 162.  The Supreme Court examined the legislative history of section 174 in order to determine what were the relevant differences between section 174 and section 162.  Id. at 503-504.  The Supreme Court then concluded that the different statutory language meant that deductions under section 174 are to be available to companies "that are upcoming and about to reach the market", as well as to "ongoing companies".  Id. at 504.

Although the taxpayer need not be conducting a trade or business at the time of the research or experimental expenditure,

in order to satisfy the trade or business requirement of section 174, the record must demonstrate that the taxpayer's prospects of entering that trade or business are realistic.  Zink v. United States, 929 F.2d 1015, 1023 (5th Cir. 1991); Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988), affg. T.C. Memo. 1986-403.  Demonstrating a realistic prospect of entering a trade or business requires proof of (1) the objective intent to enter such trade or business, and (2) the capability of doing so. Kantor v. Commissioner, 998 F.2d 1514, 1518-1519 (9th Cir. 1993) (and cases cited therein), affg. on this issue and revg. on another issue T.C. Memo. 1990-380.

"In order to qualify for the section 174 deduction, a taxpayer's existing or prospective business must be its own and not that of another entity."  Id. at 1519.  Putting it differently, the record must show that the taxpayer is not merely an investor in someone else's trade or business but is (or is to be) the conductor of its own trade or business.  Harris v. Commissioner, 16 F.3d 75, 78 (5th Cir. 1994), affg. T.C. Memo. 1990-80; Diamond v. Commissioner, 930 F.2d 372, 375-376 (4th Cir. 1991), affg. 92 T.C. 423 (1989); Green v. Commissioner, 83 T.C. at 687; see Travers v. Commissioner, 21 F.3d 424, 73 AFTR 2d 1798 (4th Cir. 1994), affg. without published opinion Harris v. Commissioner, T.C. Memo. 1990-80.

We view the record in the instant case in light of the foregoing.

As 1984 began, Systems existed; IRC and RIC had not yet been created.

Systems was developing interactive educational videodiscs and seeking to exploit the technology.  Systems needed an additional $5-8 million to bring its videodiscs to market.  IRC and RIC were created in 1984 through the efforts of Systems and Gould (Systems' financial adviser); these efforts were motivated by Systems' need for additional financing.

Gould's testimony makes it plain that IRC and RIC were created to meet Systems' need for financing research that Systems wanted to do so that Systems could exploit interactive videodisc technology.  Gould selected IRC's and RIC's potential shareholders in order to have these individuals contribute funds to IRC and RIC, in order to have IRC and RIC satisfy a portion of Systems' financial needs.  Gould was petitioners' witness. Gould's testimony completely negates any thought that IRC and RIC had the trade or business ideas and merely sought out Systems to do research in order to enable IRC and RIC to exploit new technology.  A February 27, 1984, letter from John P. Clark (hereinafter sometimes referred to as Clark) to Systems' president shows that Clark, too, understood that Systems was looking for a source of funds that Systems could use to advance

Systems' prospects to enter the "videodisc instructional systems" market.  Clark understood that "Funds are to be raised in a tax advantaged Subchapter S investment vehicle" and these funds would be used by Systems to further Systems' business efforts.  In this letter, Clark, as vice president of Scott & Stringfellow, Inc., was offering the services of his firm "to act as investment bankers for Systems".

Systems and IRC entered into three agreements.  RIC got folded into these agreements in some manner not clearly disclosed in the record.  The R & D Agreement required IRC (and RIC?) to make payments to Systems on a specified schedule in consideration of Systems' performing research, and required Systems to provide monthly reports to IRC (and RIC?).  The R & D Agreement was respected only in part by the parties thereto.  The parties herein have stipulated that the payments were not made in accordance with the R & D Agreement schedule.  The parties herein have stipulated that Systems did not provide any written periodic reports to IRC or RIC, much less the monthly reports mandated by the R & D Agreement.  The R & D Agreement gave to IRC and RIC exclusive ownership of whatever Systems' research developed.  However, the parties herein agree that "The research under the R & D Agreement was not intended to and did not result in any commercially viable product."  Although Systems failed to provide written monthly reports, it did conduct frequent meetings with

Gould and invited shareholders of IRC and RIC to discuss the progress of the research.  However, the parties herein have stipulated that "No shareholder of * * * [IRC or RIC] monitored the substance of the research being performed by Systems".  The record does not disclose how many, if any, of the shareholders attended the meetings of Systems and Gould.

Under the exclusive license agreement, IRC transferred to Systems certain rights in exchange for royalty payments.  Because of the limitations on use of various stipulated documents (supra note 7), we cannot determine on the basis of the record herein whether these rights are the rights given to IRC (and RIC?) under the R & D Agreement.  Systems did not remit to either IRC or RIC any royalties in 1984.  In light of the parties' herein agreeing that "The research under the R & D Agreement was not intended to and did not result in any commercially viable product", it is not clear whether the parties to the exclusive license agreement contemplated that Systems would ever be obligated, in a real-world sense, to make any royalty payments under the exclusive license agreement.

Under the option agreement, Systems had the option to buy all of IRC's and RIC's assets in exchange for Systems' common stock which would be (1) worth at least twice the aggregate contributed capital of IRC and RIC, and (2) at least 10 percent of Systems' outstanding common stock immediately after the

transaction. The option expired. There were negotiations. The exchange of stock for assets occurred, apparently in 1985, and perhaps on terms more favorable to IRC's and RIC's shareholders than were provided for in the option agreement.

From the foregoing, it is clear that (1) the "upcoming business" was Systems', (2) IRC and RIC were created to provide investment capital for Systems' trade or business, and (3), if things worked well, then IRC and RIC would end up with Systems stock and not with their own trade or business.

Although the R & D Agreement appeared to provide IRC and RIC with rights that theoretically they might be able to exploit in their own trades or businesses, (1) neither party to the R & D Agreement bothered to comply with some of the Agreement's specific obligations, and (2) if the rights really turned out to be valuable, then Systems had an absolute right to acquire them. In fact, even though Systems let the option agreement expire, that merely resulted in a negotiated merger into Systems and not trades or businesses for IRC and RIC. Thus, although the 1985 events deviated from the 1984 option agreement, the 1985 events confirmed[17] that element of the 1984 option agreement that controls for our purposes--Systems bought out IRC's and RIC's

---

[17]See Levin v. Commissioner, 832 F.2d 403, 406 n.3 (7th Cir. 1987), affg. 87 T.C. 698 (1986); MedChem (P.R.), Inc. v. Commissioner, 116 T.C. 308, 310 n.2 (2001), on appeal (1st Cir., Aug. 24, 2001).

assets so that if trade or business use would be made of any research or experimental expenditures, then it would be made in Systems' trade or business, and not in IRC's or RIC's.

Because of our determination, based on our findings of fact (see <u>Levin v. Commissioner</u>, 832 F.2d 403, 405 (7th Cir. 1987), affg. 87 T.C. 698 (1986)), that any research or experimental expenditures by IRC and RIC were not paid in connection with IRC's or RIC's trade or business within the meaning of section 174(a)(1), it is unnecessary for us to determine whether IRC or RIC made relevant expenditures in 1984 in at least the amounts of their respective claimed deductions, or in any amounts, and whether the expenditures that IRC or RIC made qualify as research or experimental expenditures. <u>Green v. Commissioner</u>, 83 T.C. at 691.

<u>Decisions will be entered for respondent</u>.